Joseph ALLISON and Barbara
Allison, Petitioners,

v.

PENNSYLVANIA HUMAN RELATIONS
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 12, 1998.
Decided July 16, 1998.
Publication ordered Aug. 20, 1998.

Joseph M. Spratt, Conway, for petitioners.

Nancy L. Gippert, Harrisburg, for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

FRIEDMAN, Judge.

Joseph and Barbara Allison (Allisons)[1] appeal from an order of the Pennsylvania Human Relations Commission (PHRC) that adopts the Findings of Fact, Conclusions of Law and Opinion of the PHRC's Permanent Hearing Examiner and, *inter alia*, directs the Allisons to: (1) cease and desist from any acts that have the purpose or effect of denying equal housing opportunities because of race; (2) pay Valentia Pipkin the lump sum of $8,000.00 in compensatory damages for humiliation; and (3) deliver a check for $2,000.00 payable to the Commonwealth of Pennsylvania as an assessment of a civil penalty pursuant to section 9(f)(2)(i) of the Pennsylvania Human Relations Act (PHRA).[2]

The facts, as found by the Permanent Hearing Examiner and adopted by the PHRC, are summarized as follows. The Allisons renovated a building they owned in New Brighton, Pennsylvania to create apartment units. On March 3, 1996, the Allisons advertised the imminent vacancy of one of these units, then tenanted by Renee Harrison (Harrison), a white female, and her boyfriend, a black male. Following a domestic disturbance, police had arrested Harrison's boyfriend. On the morning of March 6, 1996, Valentia Pipkin (Pipkin), a black female employed at Mellon Mortgage Company, called the Allisons to inquire about the apartment and spoke to Barbara Allison.

During the course of Pipkin's conversation with Barbara Allison, Pipkin stated that she was married with a five year old child.[3] Barbara Allison then responded that she had to be leery of mixed couples and asked Pipkin if she and her husband were of the same race. Pipkin said she was black and asked if that would be a problem, to which Allison replied, "it could be." Barbara Allison explained that two of her tenants might have a problem with Pipkin's race and move out of the building. At that point, Pipkin told Allison that she would not want to rent the apartment from a person like her and hung up.

After this conversation, Pipkin went to the bathroom in tears to gather her composure. Still crying and upset, Pipkin told her boss what had happened.[4] When Pipkin went to her boss's office, Wendy Nottingham (Nottingham), a co-worker, was present. At Pipkin's request, Nottingham agreed to call Barbara Allison to see if she would treat Nottingham any differently than Pipkin. During the call, Nottingham stated that she was looking for an apartment and that she was married with two children. Barbara Allison then asked Nottingham if she and her husband were of the same race; when Nottingham merely said "yes" without further elaboration, Allison asked "what race would that be?" Nottingham replied "caucasian" and inquired why Allison asked the question. Barbara Allison responded by relating the prior Harrison incident.

---

**1.** In this opinion, any reference to an individual Allison is to Barbara Allison only.

**2.** Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 959(f)(2)(i).

**3.** During the conversation, Pipkin also told Barbara Allison that she was withholding rent payments on her current apartment because of a leak in the roof that had caused property damage. In response, Allison was sympathetic and

helpful, suggesting that Pipkin have the leak fixed and then send the bill to her landlord along with the rent payment less the amount of the repair bill.

**4.** In a return call to Barbara Allison, Pipkin stated that she could not believe what Allison had said; Barbara Allison then related the prior problem with Harrison and her boyfriend.

Prior to Pipkin's call, the Allisons had received four other inquiries about the vacancy and had scheduled appointments with three of these people to view the apartment. On the evening of March 6, 1996, Barbara Allison showed the apartment to Holly McKay (McKay), a light-skinned, biracial woman who Allison perceived to be white, and McKay's white boyfriend. McKay informed Barbara Allison about possible credit problems; however, Allison responded by saying, "as long as both of you are white and have a job it's not a problem." McKay was unemployed at the time; however, she accepted the apartment on March 7, 1996 and gave the Allisons a security deposit. During McKay's tenancy, Barbara Allison told McKay that other tenants would be scared if Allison were to rent to a black couple. Further, Barbara Allison stated that it was her choice to whom to rent, that it was her building and that she will have the tenants she wants.

■ After her conversation with Barbara Allison, Pipkin filed a complaint with the PHRC alleging that Allison refused to deal with her and denied her an opportunity to rent one of the Allisons' apartments, in violation of section 5(h)(1) of the PHRA, 43 P.S. § 955(h)(1).[5] Following an investigation of the allegations, and after other efforts to settle the matter failed, the PHRC approved a public hearing, which was held on July 23, 1997 before a Permanent Hearing Examiner.

5. Initially, Pipkin's complaint alleged that the Allisons' actions violated sections 5(a)(1) and (3) of the PHRA, 43 P.S. §§ 955(a)(1) and (3). At the public hearing, this was determined to be a typographical error and a motion to amend was granted, allowing Pipkin to substitute allegations of a violation of sections 5(h)(1) and (3) of the PHRA for sections 5(a)(1) and (3). Pipkin also sought to amend her complaint to include an allegation of a violation of section 5(h)(6) of the PHRA, which makes it unlawful to inquire about race in connection with the lease of any housing accommodation; however, this motion was denied.

Sections 5(h)(1) and (3) of the PHRA make it an unlawful discriminatory practice:
(h) For any person to:
(1) Refuse to ... lease ... or otherwise to deny or withhold any housing accommodation ... from any person because of the race ... of any person....
....
(3) Discriminate against any person in the terms or conditions of ... leasing any housing

At the conclusion of the PHRC's case in chief, counsel for the Allisons made a motion for a compulsory non-suit which was denied. After the hearing, the Permanent Hearing Examiner gave the parties an opportunity to file post-hearing briefs within 30 days from receipt of the hearing transcript. The Allisons received their transcript on October 15, 1997; however, the PHRC entered its final order against the Allisons[6] on October 28, 1997, prior to the expiration of the allotted 30 days. The Allisons appeal from that order.[7]

■ The Allisons first contend that, because Pipkin failed to establish a prima facie case of housing discrimination, the PHRC's Permanent Hearing Examiner erred in denying the Allisons' motion for a compulsory non-suit. However, in making this argument, the Allisons fail to recognize that the Permanent Hearing Examiner based his determination on direct evidence that Barbara Allison had discriminated against Pipkin. Where direct evidence of discrimination is presented, such evidence, if supported by a preponderance of the evidence, is sufficient to support a finding of discrimination. *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447 (4th Cir.), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990). We agree that direct evidence of discrimination existed in this case. As the Permanent Hearing Examiner noted in his opinion:

accommodation ... because of the race ... of any person....
43 P.S. § 955(h)(1) and (3). As the Permanent Hearing Examiner noted, because Pipkin never leased an apartment from the Allisons, she sets forth no section 5(h)(3) violation; rather, her complaint constitutes an alleged violation of section 5(h)(1) only.

6. Although Joseph Allison had no apparent role in his wife's discriminatory action, as co-owner of the housing accommodation, he was deemed vicariously liable for Barbara Allison's actions.

7. Our scope of review of an order of the PHRC is limited to determining whether there was a violation of constitutional rights, whether there was an error of law or whether the findings of fact necessary to support the adjudication are supported by substantial evidence. *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 127 Pa.Cmwlth. 436, 561 A.2d 1320 (1989).

Here, by a direct and unambiguous showing, Pipkin has established that when she asked Barbara Allison if it would be a problem that she is black, Barbara Allison responded that "it could be." Barbara Allison admitted that she had made that response to Pipkin's inquiry. A statement by a person engaged in rental of a housing accommodation that either conveys that housing is unavailable because of race or expresses a preference for or limitation on a potential renter because of race violates Section 5(h)(1) of the PHRA. When Barbara Allison told Pipkin that her race could be a problem, Barbara Allison's action had the effect of deliberately discouraging Pipkin. Such an action amounts to a refusal to negotiate with Pipkin because of her race and evidences a racially subjective leasing procedure.

(Permanent Hearing Examiner op. at 12–13.)

■ Moreover, contrary to the Allisons' claim, we believe that the record does support a prima facie case of housing discrimination. In *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission*, 516 Pa. 124, 532 A.2d 315 (1987), our supreme court set forth the standards for proving a prima facie case of discrimination. Adapting those standards to accommodate the nature of the discrimination alleged here, the PHRC would have to establish that: (1) Pipkin is a member of a protected class; (2) the Allisons were aware of Pipkin's race; (3) Pipkin was qualified to rent the property in question; (4) Pipkin was denied the opportunity to rent the apartment; and (5) the apartment remained available for rent.

■ Here, the Allisons contend that counsel for the PHRC established only the first two of these elements in its case in chief; however, we conclude that the evidence pre-sented is sufficient to establish the remaining three elements as well. Because Pipkin was employed and could afford the rent, she was qualified to rent the apartment.[8] Further, Pipkin was effectively denied the opportunity to rent the apartment when she was told that her race would be a problem. Finally, the record indicates that the apartment remained available after it was denied to Pipkin. In fact, no one viewed the apartment until the evening of March 6, 1996, after the conversation between Barbara Allison and Pipkin. By that time, the discrimination had already occurred. Accordingly, the Permanent Hearing Examiner properly denied the Allisons' motion for compulsory non-suit.

■ Next, the Allisons assert that they were denied their procedural due process rights because the Permanent Hearing Examiner engaged in quasi-prosecutorial questioning of the PHRC's witnesses, resulting in an improper commingling of the PHRC's prosecutorial and adjudicative functions. Relying on *Lyness v. State Board of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992), the Allisons contend that the Permanent Hearing Examiner created an impermissible appearance of bias by questioning Pipkin with regard to matters not addressed by the PHRC's attorney during the PHRC's case in chief. The Allisons maintain that the Permanent Hearing Examiner supplemented the record by raising these additional matters and, had he not done so, the record would not and could not have supported a finding of discrimination. Therefore, the Allisons contend that this court must set aside the PHRC's order based on those findings. Again, we disagree.

The questioning of a witness by a hearing examiner is authorized by law; indeed, in questioning witnesses about matters not raised by the prosecution, the Permanent

---

8. The Allisons argue that Pipkin was not qualified to rent the apartment because she was two months in arrears to her present landlord; however, the Permanent Hearing Examiner points out the fallacy in this argument, noting that Barbara Allison never conveyed to Pipkin that the act of her withholding rent disqualified her from renting the Allisons' apartment. To the contrary, it was after discussing the rent withholding issue that Allison sought information from Pipkin regarding her race and that of her spouse; had Pipkin been disqualified from consideration because of the rent problem, such further conversation would have been unnecessary. We would also point out that such a claim by the Allisons lacks credibility in light of the fact that McKay was able to rent the apartment despite being unemployed and revealing a less than stellar credit history.

Hearing Examiner was acting in accordance with 16 Pa.Code § 42.111, which not only allows a hearing examiner to require additional evidence but also specifically grants the hearing examiner the power "[t]o call and examine witnesses." [9]  16 Pa.Code §§ 42.111 (9) and (10).

Moreover, such authorized questioning should not be deemed to constitute an impermissible commingling of prosecutorial and adjudicative functions sufficient to violate due process.  Given the recognized flexibility of administrative proceedings, hearing examiners clearly are not required to assume a purely passive role in conducting those proceedings.  Although a hearing examiner should not assist a prosecutor in a way that demonstrates bias, the authorized questioning of witnesses by the Permanent Hearing Examiner here, in an attempt to clarify the evidence and the claims, is a far cry from the situation in *Lyness,* where members of the administrative board who determined that a professional licensing prosecution should be initiated were the very same board members involved in the ultimate adjudication of the charges.

The Allisons also argue that they were denied procedural due process because they were not permitted to file a post-hearing brief.  The parties had been directed to file a post-hearing brief within thirty days after receipt of the transcript.  According to the Allisons, the PHRC and the Permanent Hearing Examiner were well aware that the Allisons did not receive their transcript until October 15, 1997, a day after the submission deadline, because counsel for the Allisons informed them by letter sent on that date.[10] The Allisons contend that, despite this knowledge, the PHRC entered its final order on October 28, 1997, without affording the Allisons the opportunity to file a post-hearing brief.  Relying on *Bengal v. State Board of Pharmacy,* 2 Pa.Cmwlth. 347, 279 A.2d 374 (1971), the Allisons claim that this constitut-

ed a due process error requiring this court to set aside the PHRC's order.

■  The PHRC asserts that the Allisons were never denied an opportunity to file a post-hearing brief.  In support of this contention, the PHRC points to an October 29, 1997 letter written by the Permanent Hearing Examiner in response to the Allisons' letter of October 15, 1997, which provided:

> The purpose of this letter is to respond to your letter dated October 15, 1997, which was received in my office on Monday, October 20, 1997.  In your letter you indicated that you had not received a copy of the transcript in the referenced case until October 15, 1997.  Your letter further indicated that opposing counsel had no objection to an additional thirty days to file a post-hearing brief.

> According to my calculations, post-hearing briefs had been due on or before October 14, 1997.  Having received neither a post-hearing brief nor a request for a continuance from you, on October 15, 1997 my recommended findings, along with the full record in this matter, was forwarded to the PHRC Commissioners for their review and consideration.

> On October 17, 1997, I commenced a week's vacation and upon my return, I was informed of your letter.  During my absence I had instructed my colleague to either field any call requesting an extension or to forward any post-hearing brief to the Commissioners for inclusion in the materials previously sent.

> As you are perhaps aware, the PHRC met on October 27, 1997 and acted on my recommendations.  Prior to their action, I informed them of the specifics of the chronology of events regarding the absence of your post-hearing brief and advised them of the content of your October 15, 1997 letter.  Since you failed to make a timely request for an extension, they adjudicated

---

**9.** The Allisons have not raised a constitutional challenge to this regulation and, thus, have waived the right to make this challenge now.

**10.** The letter, addressed to the Permanent Hearing Examiner, stated:

> Please be advised that I have just today received the transcript of the above-captioned hearing which was held on July 23, 1997. Opposing counsel has no objection to our office using the thirty (30) day period from today's date to file our Post Hearing Brief.
> (R.R. at 38a.)

the referenced matter without consideration of any brief on behalf of the Respondents.

(R.R. at 10a–11a.) According to the PHRC, this letter demonstrates that, unlike the petitioner in *Bengal*,[11] the Allisons were given a full and fair opportunity to protect their interests, but simply neglected to take advantage of that opportunity when they neither submitted a post-hearing brief nor made a proper request for an extension of time to make the submission. Here, the PHRC issued its order without considering any post-hearing brief on behalf of the Allisons, in seeming violation of the Administrative Agency Law, 2 Pa.C.S. § 506; however, because we agree that the PHRC's action was the result of the Allisons' failure to avail themselves of the process afforded them, rather than of the PHRC's denial of due process to the Allisons, we conclude that the PHRC's order need not be set aside on that basis.

■ Next, the Allisons argue that the PHRC erred in awarding $8,000.00 in compensatory damages to Pipkin for humiliation she suffered as a result of discrimination because the record does not contain substantial evidence to support a finding that the Allisons discriminated against Pipkin based on her race. To the contrary, the Allisons contend that the record clearly fails to establish that they engaged in any discriminatory practices. Specifically, the Allisons maintain that the record indicates that they used a waiting list to address inquiries into any vacant apartment, and because the Allisons, in fact, rented the apartment to a black

individual (McKay) who had priority on the waiting list, no discrimination could be found. We cannot accept the Allisons' argument.

■ In his opinion, the Permanent Hearing Examiner expressly discredited the Allisons' claim "that their procedures for finding tenants excluded Pipkin from renting their vacant apartment" because applicants are prioritized in order of their inquiry. Indeed, the Permanent Hearing Examiner pointed out that the record showed that the Allisons did not adhere to a prioritized list in showing the apartment, a fact which Barbara Allison attempted to conceal with McKay's assistance.[12] (Permanent Hearing Examiner's op. at 13–15.) Here, the determination of discrimination was based on supported findings of fact reflecting the Permanent Hearing Examiner's reasonable and careful weighing of the evidence, his assessment of credibility and his construction of the inferences from the testimony before him. These findings were fully adopted by the PHRC in its role as factfinder. Because the PHRC has broad discretion in fashioning a remedy when discrimination has been found, the PHRC did not err in awarding Pipkin $8,000.00 in compensatory damages for the humiliation she suffered.

Finally, the Allisons contend that the PHRC erred in basing its order on violations which had not been alleged. In making this argument, the Allisons appear to challenge evidence in the record that would support a finding that the Allisons violated section 5(h)(6) of the PHRA, a charge which was not alleged in Pipkin's complaint. However, be-

11. The petitioner in *Bengal* appealed from an adjudication of the State Board of Pharmacy (Board) that suspended the petitioner's pharmacy license, arguing that he was denied due process when he was not afforded an opportunity to file a brief with the Board prior to the adjudication. We noted that, following his hearing, the petitioner had requested to be notified when the transcript was transcribed and filed so that he could file a brief, but that, despite this request, the next word the petitioner received was that the adjudication and order had been filed over a month earlier. Under these circumstances, we concluded that the Board's action constituted a violation of the Administrative Agency Law's mandatory provision that parties be afforded an opportunity to submit briefs prior to adjudication as well as a violation of the petitioner's constitu-

tional due process rights. Accordingly, we remanded the case to the Board to give the petitioner an opportunity to file a brief. In contrast to the situation in *Bengal*, here, the Allisons received a copy of the transcript almost two weeks prior to the PHRC's adjudication, during which time the Allisons either could have filed their brief or requested an extension of time in which to make that filing. By failing to take either course of action, the Allisons forfeited the opportunity to plead their case to the PHRC.

12. As to the fact that, in renting to McKay, Barbara Allison rented the apartment to a "black" tenant, the findings clearly indicate that Allison perceived McKay as white and rented to her on that basis. (N.T. at 148.)

cause the PHRC's order was based solely upon a violation of section 5(h)(1) of the PHRA, an allegation fully set forth in the complaint, the Allisons argument is without merit. In fact, although the Permanent Hearing Examiner recognized that some of the evidence submitted could support a violation of section 5(h)(6) of the PHRA, he specifically ruled that such evidence had no impact on the Allisons' liability because Pipkin's complaint did not contain an allegation of a section 5(h)(6) violation and because Pipkin's motion to amend her complaint to add this allegation was denied. (Permanent Hearing Examiner's op. at 15, 16.)

Accordingly, for the foregoing reasons, we affirm the PHRC's order.

## ORDER

AND NOW, this 16th day of July, 1998, the order of the Pennsylvania Human Relations Commission, dated October 28, 1997, is hereby affirmed.