**CANAL SIDE CARE MANOR, LLC d/b/a Canal Side Care Manor and Lakshmi Kademani, Petitioners**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 6, 2011.

Decided Oct. 20, 2011.

Garrett R. Benner, Bethlehem, for petitioners.

Stephanie M. Chapman, Assistant Chief Counsel, Harrisburg, for respondent.

Ronda B. Goldfein and Sarah R. Schalman–Bergen, Philadelphia, for intervenor, G.D.

BEFORE: SIMPSON, Judge, and McCULLOUGH, Judge (P.), and KELLEY, Senior Judge.

OPINION BY Judge McCULLOUGH.

Petitioners Canal Side Care Manor, LLC d/b/a Canal Side Care Manor (Canal Side) and its owner, Lakshmi Kademani

(Kademani), appeal from the September 28, 2010, decision and order of the Pennsylvania Human Relations Commission (Commission), which held that Petitioners · acted to remove G.D.[1] from Canal Side because she has HIV (human immunodeficiency virus), thereby violating sections 5(e) and (h) of the Pennsylvania Human Relations Act (PHRA).[2] The Commission awarded G.D. $50,000 in compensatory damages, with six percent interest, and imposed a $5,000 civil penalty. The Commission also ordered Petitioners to stop engaging in acts and practices that have the effect of denying equal housing opportunities because of an individual's disability and to establish policies that specifically state that Canal Side will admit otherwise qualified persons with HIV/AIDS.

This litigation commenced in April 2008 when Queen D., G.D.'s sister, filed a complaint on G.D.'s behalf alleging that Canal Side and Kademani intentionally discriminated against G.D. by denying her a housing accommodation because she has HIV.[3] Count I of the complaint alleged that Canal Side and Kademani violated section 5(h) of the PHRA [4] when they evicted G.D. because of her HIV. Count II alleged that

---

1. The parties stipulated that the complainant in this matter shall be referred to as "G.D." (Joint Stipulation of Facts, Commission's decision at 2.)

2. Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(e), (h). The parties have stipulated that HIV is a qualifying disability under the PHRA. (Joint Stipulation of Facts, Commission's decision at 3.)

3. Queen D. filed a complaint against Petitioners with the Commission in April 2008 and an amended complaint in November 2009.

4. Section 5(h) states that it shall be an unlawful discriminatory practice

    (h) For any person to:

(1) Refuse to sell, lease, finance or otherwise to deny or withhold any housing accommodation or commercial property from any person because of the race, color, familial status, age, religious creed, ancestry, sex, national origin or handicap or disability of any person, prospective owner, occupant or user of such housing accommodation or commercial property, or to refuse to lease any housing accommodation or commercial property to any person due to use of a guide animal because of the blindness or deafness of the user, use of a support animal because of a physical handicap of the user or because the user is a handler or trainer of support or guide animals or because of the handicap or disability of an individual with whom the person is known to have a relationship or association.
43 P.S. § 955(h).

Kademani aided and abetted Canal Side's eviction of her in violation of section 5(e) of PHRA.[5]

The Commission appointed a three-member Hearing Panel which conducted a public hearing on the complaint and heard testimony from the following witnesses: G.D.; Queen D.; Robert M. Swenson, M.D., an expert in the field of infectious diseases; Jaime Bloss, a nurse-practitioner for the East–Community HIV/AIDS Organization; Aurora M. Anaya, an intensive case manager with Step by Step; Cherie Zettlemoyer, intensive case management supervisor at Step by Step; Kademani, owner and administrator of Canal Side; Ruth Sillers, a personal care aide at Canal Side; Sandra Dahlia, Canal Side's medication clerk; and Daneen Reese, a consultant with expertise in the field of case management.

The Hearing Panel issued a 51–page recommended decision setting forth 182 Findings of Fact. By final order dated September 28, 2010, the Commission adopted the Hearing Panel's Findings of Fact (FOF), Conclusions of Law, and Opinion as its own.

We summarize the Commission's findings briefly, as follows.

Canal Side is a 62–bed facility for men and women in Walnutport, Pennsylvania, and is registered by the Department of Public Welfare as a personal care home. Canal Side specializes in caring for low income individuals suffering from mental illness. Kademani is the sole owner and administrator of Canal Side. (FOF 2, 12, 51–55.)

G.D. is 36 years old; she is bi-polar and schizophrenic and was diagnosed with HIV in 1998. Also, at some point, G.D. developed shingles.[6] In 2007, G.D. was living in a group home run by Step by Step, a human services agency whose programming is designed to assist individuals move toward greater independent living. Clients at Step by Step are assisted by an Intensive Case Manager (ICM), who provides assistance with transportation, job searches and other things. Aurora Anaya (Anaya) was G.D.'s ICM. (FOF 18, 19, 23–26.)

While living at Step by Step's group home, G.D. experienced problems with basic daily living skills, hygiene, and urinary incontinence. G.D. wore a diaper every day, and she was put on a queuing program and a training program. Nevertheless, by December 2007, G.D.'s incontinence problem was severe. Ultimately, Step by Step staff, Anaya, and Queen D. agreed that they should seek placement for G.D. in a personal care home where she could receive a higher level of care and supervision. (FOF 31, 36–44, 49.)

Canal Side was contacted and eventually had an opening for G.D. Step by Step staff and Anaya facilitated G.D.'s placement arrangements with Kademani and her staff. During a December tour of Canal Side with G.D., Anaya completed pre-admission

---

5. Section 5(e) states that it shall be an unlawful discriminatory practice

(e) For any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 P.S. § 955(e).

6. Shingles is caused by the virus varicella zoster, commonly known as chickenpox, and breaks out as a blistering rash. An individual with fluid-filled blisters is contagious to a person that has never had chickenpox. (FOF 32–35.)

forms, and she failed to disclose the severity of G.D.'s incontinence problem. She also did not disclose G.D.'s HIV status because Step by Step policies prohibited her from doing so.

G.D. was moved into Canal Side on the morning of January 2, 2008. Again, Anaya was not forthcoming about G.D.'s incontinence problem. However, Canal Side staff members who unpacked G.D.'s clothes noticed that they were urine-soaked and washed them. By 2:30 p.m., G.D. had been placed on Canal Side's toileting plan, which entailed queuing G.D. to go to the bathroom periodically during the day and waking her every two hours through the night to use the bathroom. Anaya was to supply a complete medical evaluation for G.D. within the required 30–day period. (FOF 61–89, 91–94.)

Later that afternoon, Canal Side's medication clerk was checking in G.D.'s medications and became concerned that G.D. was taking Valtrex. G.D. was called to the medication room and said she was taking that medication because she had shingles and that she had shingles because she has HIV. (FOF 91–97.)

The medication clerk called an assistant administrator, who asked Kademani to come to the medication room and clarify G.D.'s HIV status. When asked, G.D. told Kademani that she takes medication for HIV. Kademani then told G.D. that she had 24 hours to leave the facility. (FOF 101–05; Commission's op. at 30–35.)

Thereafter, Kademani contacted Bloss, G.D.'s healthcare provider, and left a message that she had an urgent emergency situation. Bloss called back later that afternoon and was put on speakerphone in Kademani's office. Kademani told Bloss that she and her staff were concerned about HIV transmission and the risk that G.D. posed, and she specifically asked whether a person can get HIV from urine in clothing or on a chair. Bloss explained that G.D. was not a risk as long as universal precautions were used and, after the conversation, entered a note to G.D.'s file. Kademani also called Anaya and was extremely upset that Anaya had not disclosed G.D.'s HIV status; she told Anaya that G.D. had to leave Canal Side right away. Anaya got the impression from Kademani that her staff was walking out because they had touched G.D.'s soiled clothes. Kademani also indicated that she would soon be leaving the country. (FOF 96–127.)

Subsequently, Kademani advised Anaya's supervisor that she was unwilling to let G.D. stay at Canal Side until a transition plan was developed because her staff was threatening to quit due to their fear of contracting AIDS. When Kademani told Anaya's supervisor that Canal Side used universal precautions, the supervisor said the staff had no reason to be fearful. However, despite the supervisor's efforts to quell her fears, Kademani refused to provide G.D. with extended care options. (FOF 130–36.)

The following morning, January 3, 2008, Anaya called Queen D. and advised her that G.D. might be dismissed from Canal Side. Queen D. called Kademani and was told that G.D. could not stay at Canal Side because she would infect the staff. The conversation became heated, and Queen D. felt that G.D. was no longer safe at Canal Side. Meanwhile, that morning, a staff member discovered that G.D. had soiled her bed, cleaned it up, disinfected the bed and put on clean linens. Because changing a client's bed linens is part of the normal routine, the employee did not remark on this or write it down. (FOF 137–50.)

Later that day, Queen D. and another of G.D.'s sisters went to Canal Side to pick

up G.D. No one at the facility asked Queen D. why she was taking G.D. home. Also later that day, at Kademani's orders, an employee wrote in her shift report that all employees need to wear gloves at all times. (FOF 152–62.)

When G.D. first returned to Queen D.'s home, she was happy to see her children, but, after a short time she became more depressed and tearful than she had been in the past. G.D. was embarrassed that she was not permitted to stay at Canal Side and she did not want either Queen D. or her children to know why she was made to leave the facility. Eventually, Queen D. concluded that she could no longer care for G.D. at her home and contacted Anaya. Anaya took G.D. to a shelter, which after a day or two referred G.D. to a hospital for a psychiatric evaluation. Because G.D. had nowhere to go, the hospital did not discharge her, and instead she remained on "lock down" on the hospital's psychiatric floor for approximately three months. At the end of May 2008, the hospital referred G.D. to a facility called Manor Care where she currently resides. (FOF 170–82.)

█ In its opinion, the Commission recognized that this Court has adopted the proof standards normally applied in employment cases for use in housing discrimination claims. *Allison v. Pennsylvania Human Relations Commission,* 716 A.2d 689 (Pa.Cmwlth.1998). Thus, as a general rule, there are two ways to approach a discrimination claim: the *McDonnell Douglas*[7] three-part, burden-shifting analysis or proof by direct evidence. Where direct evidence of discrimination is pre-sented, such evidence may be sufficient to support a finding of discrimination. *Allison.*

The Commission also noted that much of the relevant testimony it heard was conflicting, and the Commission explained its assessments of witness credibility at length. The Commission cited numerous contradictions within Kademani's testimony and found her testimony completely lacking in credibility. The Commission also found that Anaya's credibility was "a bit weakened" by some of her actions and testimony concerning G.D.'s incontinence. Finally, the Commission recognized slight contradictions in the testimony offered by Queen D. and G.D.

Based on its credibility determinations, the Commission first determined that "G.D.'s bladder incontinence was not a meaningful problem for Canal Side." (Commission's op. at 36.) To the contrary, the Commission concluded that G.D. had demonstrated by direct evidence that Kademani insisted that G.D. leave Canal Side immediately because she had HIV. Accordingly, the Commission concluded that Canal Side and Kademani were jointly liable to G.D. for violating section 5(h)(1) of PHRA. The Commission further found Kademani individually liable for her own acts of discrimination under section 5(e) of the PHRA under an aiding and abetting theory.

With respect to damages, the Commission cited the broad authority to fashion a remedy afforded to the Commission by section 9(f)(1) of the PHRA.[8] Finding that

---

7. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, a complainant must establish a prima facie case by a preponderance of the evidence. If a prima facie case is presented, the respondent must articulate a legitimate non-discriminatory reason for its action. If the respondent does so, the burden shifts to the complainant to prove by a preponderance of the evidence that the articulated reason is pretextual and the real reason is discriminatory.

8. In relevant part, section 9(f)(1) of the PHRA states as follows:

the testimony of G.D. and Queen D. sufficiently supported a claim for damages resulting from embarrassment and humiliation due to discrimination, the Commission awarded G.D. $50,000 in damages plus interest. Finally, the Commission imposed a civil penalty in the amount of $5,000.[9] Petitioners now appeal to this Court.[10]

■ "Our scope of review, of course, is limited to a determination of whether constitutional rights have been violated, whether necessary findings of fact are supported by substantial competent evidence or whether the Commission has made an error of law." *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 136 Pa.Cmwlth. 381, 583 A.2d 50, 52 (1990) (citation omitted). The Commission is the sole judge of witness credibility and evidentiary weight. *Id.*

■ On appeal, Petitioners set forth the *McDonnell Douglas* analysis and argue that they had a legitimate non-discriminatory reason, G.D.'s severe incontinence, for denying G.D. a place in the facility. However, Petitioners' argument ignores the Commission's credibility determinations, as well as the Commission's numerous findings of fact and legal conclu-

sions, which are supported by the credible testimony. The Commission rejected Kademani's testimony and specifically found that "G.D.'s bladder incontinence was not a meaningful problem for Canal Side," explaining its reasoning, and citing support in the record. (Decision at 36–38.) In addition, the Commission explicitly found that G.D. had proven her case by *direct evidence*. As noted above, where direct evidence of discrimination is presented, such evidence may be sufficient to support a finding of discrimination. *Allison; see also The New Corey Creek Apartments v. Pennsylvania Human Relations Commission*, 865 A.2d 277, 281 n. 3 (Pa.Cmwlth. 2004) (where direct evidence establishes discriminatory intent, the need to apply the burden-shifting *McDonnell Douglas* analysis is eliminated). Thus, Petitioners' first argument is without merit.

■ Petitioners next contend that the Commission erred with respect to the award of damages. In matters filed under section 5 of the PHRA, the Commission is authorized to award damages for embarrassment and humiliation. 43 P.S. § 959(f)(1); *New Corey Creek Apartments*. The goal of the PHRA is to make persons

---

If, upon all the evidence at the hearing, the Commission shall find that a respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the Commission shall state its findings of fact, and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to . . . the making of reasonable accommodations . . . and [reimbursement of] any other verifiable, reasonable out-of-pocket expenses caused by such unlawful discriminatory practice, provided that, in those cases alleging a violation of section 5(d), (e) or (h) or 5.3 where the underlying complaint is a violation of section 5(h) or 5.3, *the Commission may award actual damages, including damages caused*

*by humiliation and embarrassment, as, in the judgment of the Commission, will effectuate the purposes of this act, and including a requirement for report of the manner of compliance.*

43 P.S. § 959(f)(1) (emphasis added) (footnotes omitted).

9. Section 9(f)(2)(i) of the PHRA authorizes the Commission to assess a civil penalty against a respondent in a discrimination complaint filed under section 5(h) in an amount not exceeding ten thousand dollars ($10,000) if the respondent has not been adjudged to have committed any prior discriminatory practice. 43 P.S. § 959(f)(2)(i).

10. G.D. filed a notice of·intervention with this Court on December 6, 2010.

whole for injuries suffered as a result of discrimination, and the Commission's authority to fashion remedies is entitled to great deference. *Id.*

In *New Corey Creek Apartments*, the Commission awarded $25,000 in compensatory damages to an African–American former tenant for humiliation and embarrassment arising from her landlord's race discrimination. The Commission credited the tenant's testimony that the landlord's racial slurs made her want to cry, that the landlord took everything from her as a black individual and as a mother, that she was under stress, and that she felt that the landlord treated her as less than a human. The Commission also credited corroborating testimony from the former tenant's friend and from her mother. The appellants, owner and manager of the former tenant's apartment, argued that the Commission abused its discretion because the former tenant presented no evidence regarding the manner in which the complained-of conduct affected her daily life, that it affected her career, or that she experienced any physical symptoms of distress, such as eating or sleeping problems, or depression.

Affirming the Commission's award of damages for embarrassment and humiliation, we noted in *New Corey Creek Apartments* that, once a finding of discrimination is made, the decision as to the appropriate amount of an award is extremely fact-specific. Thus, "evidence regarding both the nature of the discriminatory conduct and the victim's reaction thereto is key." *Id.* at 282–83. Further, we explained that this Court "will not disturb a remedial order of the Commission unless it constitutes a patent attempt to achieve ends that cannot fairly be said to effectuate the policies of the [PHRA]." *Id.* at 283 (citation omitted).

■ Petitioners assert that no damages should be awarded in this case because G.D. is bipolar, the onset of her depression was not new, and it was not caused by her leaving Canal Side. Petitioners argue that the alleged violation of the PHRA resulted from "a material misrepresentation of G.D.'s medical condition" and that, "[i]f full disclosure was made at the pre-admission screenings, Kademani would have never admitted G.D. into [Canal Side]." (Petitioners' brief at 15.) Suffice it to say that in making this argument Petitioners again ignore the Commission's findings and the factors the Commission considered in concluding that $50,000 is "appropriate to compensate G.D. for the humiliation and embarrassment she suffered *which was neither transient nor trivial.*"[11] (Commission's decision at 46) (emphasis added).

---

11. The Commission stated in part as follows:

Until Kademani, with cold indifference, bluntly told G.D. that she would have to leave Canal Side because of her HIV, G.D. was prepared to make the best of her situation. Upon being told she had to leave within 24 hours, G.D. cried for an extended time. G.D. called Queen D. but was too embarrassed to tell her what had transpired and that she had been told to leave Canal Side.

Once back at Queen D's home, G.D. was initially happy to see her children but it did not take G.D. long to become quiet and pace the house. Queen D. also testified that upon her arrival at Queen D's home, G.D.'s sadness and fearfulness were much greater than before. When G.D. and Queen D. spoke of the reasons Queen D. came to get G.D. from Canal Side, G.D. cried. G.D. continued to be embarrassed about being "thrown out" of Canal Side after thinking she had done nothing wrong.

For several months after having been brought back to Queen D's home, the entire family and neighbors made sacrifices to assist with G.D.'s care. However, after several months, Queen D. came to the conclusion that she could no longer care for G.D. G.D. was taken to a shelter where after approximately two days she was referred to St. Luke's Hospital for mental evaluation.

Moreover, although Petitioners neither challenge nor acknowledge any of the Commission's findings, we note that our review confirms that they are supported by substantial evidence, including the competent, live testimony of witnesses found credible by the Commission. In light of the Commission's findings, and mindful of the broad authority and discretion conferred upon the Commission by section 9(f)(1) of the PHRA, *New Corey Creek Apartments*, we conclude that the award of damages is properly characterized as an attempt to effectuate the policies of the PHRA, and we discern no legal error or abuse of discretion in the award of damages here.

■■ Having rejected Petitioners' arguments, we next address G.D.'s request for an award of counsel fees and delay damages pursuant to Pa. R.A.P. 2744.[12] Under Rule 2744, an appellate court may, in its discretion, award reasonable counsel fees and delay damages against a party if it determines that an appeal is frivolous or taken solely for delay, or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious. The imposition of counsel fees is solely within the discretion of the court. *Larry Pitt & Associates v. Long*, 716 A.2d 695 (Pa.Cmwlth.1998). In determining the propriety of such an award, the court is "ever guided by the principle that an appeal is not frivolous simply because it lacks merit. Rather, it must be found that the appeal has no basis in law or fact." *Menna v. St. Agnes Medical Center*, 456 Pa.Super. 301, 690 A.2d 299, 304 (1997). Such a high standard is imposed "in order to avoid discouraging litigants from bringing appeals for fear of being wrongfully sanctioned." *Id.*

Upon consideration of Petitioners' brief and a careful review of the record, we conclude that that high standard is met in this case.

> Having no place to discharge G.D., St. Luke's kept G.D. in a locked psychiatric unit until a suitable placement could be found. G.D. remained in the locked environment for approximately three months.
>
> While at St Luke's G.D. periodically called Queen D. pleading with her to bring her home. G.D. told Queen D. that by being at St. Luke's she was "with a bunch of kooks," and she does not "belong here." Queen D. emotionally testified that she had to tell G.D. that she could not take her. Eventually, a suitable placement was found for G.D. and she was released from St. Luke's and moved to Manor Care, the facility where G.D. currently resides.
>
> (Commission's op. at 44–45.)

12. Rule 2744. Further Costs. Counsel Fees. Damages for Delay

> In addition to other costs allowable by general rule or Act of Assembly, an appellate court may award as further costs damages as may be just, including
>
> (1) a reasonable counsel fee and
> (2) damages for delay at the rate of 6% per annum in addition to legal interest,

> if it determines that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious. The appellate court may remand the case to the trial court to determine the amount of damages authorized by this rule.
>
> We note that Pa. R.A.P. 2751 establishes a procedure for requesting reimbursement for costs recognized in Pa. R.A.P. 2744 after a final decision is entered. However, this court has previously treated a request for counsel fees based on frivolity as if it were an application when, as here, it is made as part of the requesting party's appellate brief on the merits. Accordingly, we will dispose of the request as part of the disposition of the merits of this case. *See Watkins v. Unemployment Compensation Board of Review*, 689 A.2d 1019 (Pa.Cmwlth.1997); *Savini v. Department of Transportation, Bureau of Driver Licensing*, 154 Pa.Cmwlth. 653, 624 A.2d 696 (1993); and *Swoyer v. Department of Transportation*, 142 Pa.Cmwlth. 1, 599 A.2d 710 (1990).

In *Zwibel v. Department of Transportation, Bureau of Driver Licensing*, 832 A.2d 599 (Pa.Cmwlth.2003), the court explained its award of counsel fees as follows:

> We are mindful that the imposition of counsel fees is a step not to be taken lightly. In this instance, however, it is not possible to divorce the determination of whether the imposition of counsel fees is warranted [from] the fact that the trial court in this case issued a careful and comprehensive ten-page opinion that not only drew all relevant credibility determinations and findings of fact, but also quite clearly and accurately set forth the law with regard to the burdens of the Department and the licensee in license suspension appeals. The trial court explained precisely why Zwibel's probable cause argument was irrelevant and further explained why the Department met its burden and why he did not meet his under the facts found to be credible. Yet, in the present appeal, Zwibel wholly ignores the trial court's opinion and the supporting cases set forth therein. Instead, Zwibel reasserts (1) his facially meritless argument[s]. . . .

*Zwibel*, 832 A.2d at 607. The present appeal is substantially similar to *Zwibel*, in that Petitioners wholly ignore the comprehensive opinion issued by the Commission.

■ Whereas the Commission decided this matter based on direct evidence of discrimination, explaining that the *McDonnell Douglas* analysis is not applicable under the circumstances, Petitioners' Statement of Questions involved asks whether the Commission erred in determining that Petitioners' actions were discriminatory when Petitioners presented a non-discriminatory basis for their behavior—i.e., whether the Commission erred in applying the *McDonnell Douglas* analysis. We explained in *Allison* that direct evidence may be sufficient to support a finding of discrimination, and, although Petitioners cite *Allison* for the applicable scope of review, they ignore the remainder of that decision.[13]

■ An award of counsel fees and delay damages is warranted where an appeal is based solely on facts contrary to those found by the trier of fact. *See, e.g., Reinhart v. Department of Transportation, Bureau of Driver Licensing*, 954 A.2d 761, 768 (Pa.Cmwlth.2008) ("basing an appeal solely on facts contrary to those found by the trial court is frivolous"). Here, Petitioners base their appeal solely on facts contrary to those found by the Commission, the trier of fact in this case. Petitioners continue to insist that G.D.'s incontinence was a compelling problem that led to her removal from Canal Side, whereas the Commission specifically found that G.D.'s bladder control was not a meaningful problem.[14] (Commission op. at 36–37.)

13. Rejecting the Allisons' contention that they were entitled to a compulsory non-suit, we explained:

> [I]n making this argument, the Allisons fail to recognize that the permanent Hearing Examiner based his determination on direct evidence that Barbara Allison had discriminated against Pipkin. Where direct evidence of discrimination is presented, such evidence, if supported by a preponderance of the evidence, is sufficient to support a finding of discrimination.

*Allison*, 716 A.2d at 691.

14. The Commission explained as follows:

> Clearly, Canal Side staff knows how to care for residents who are incontinent. Further, on the evening of January 2, 2008, besides G.D., nine other residents were on a schedule where they were awakened up [sic] every 2 hours through the night to go to the bathroom. Canal Side also had a queuing program where incontinent residents were reminded every few hours during the day to go to the bathroom. . . . Indeed, Kademani admitted that newly admitted residents are assessed at admission and, if incontinent,

Moreover, while there is no question that the Commission is the final arbiter of witness credibility and evidentiary weight, Petitioners' scant argument is fairly characterized, in its entirety, as a mere challenge to the Commission's credibility determinations. We emphasize that Petitioners' essential assertions are supported only by Kademani's testimony, despite the fact that the Commission considered the numerous contradictions in Kademani's testimony in detail, (Commission's op. at 30–34), and concluded that, "[c]onsidered as a whole, the record reveals that Kademani's lack of credibility on so many levels is blatantly obvious." (Commission's op. at 35.)

We also have awarded counsel fees and delay damages pursuant to Rule 2744 where an appellate brief does not conform to the Pennsylvania Rules of Appellate Procedure. *See* e.g., *Watkins v. Unemployment Compensation Board of Review*, 689 A.2d 1019 (Pa.Cmwlth.1997) (citing deficiencies in the statement of the facts, summary of the argument and argument portions of the appellant's brief as additional reasons supporting an award of counsel fees).

Here, Petitioners' brief does not include the text of the Commission's order, as required by Rule 2115. Petitioners' Summary of the Argument, which asserts facts not supported by the record, exceeds two pages, in violation of Rule 2118. Significantly, rather than setting forth "all the facts which are necessary to be known" in order to decide the case, as dictated by Rule 2117, Petitioners' Statement of the Case *omits virtually every relevant fact* related to G.D.'s stay at Canal Side and subsequent withdrawal from the facility. It includes no reference whatsoever to HIV, any of the Commission's 182 findings, or the Commission's explicit credibility determinations set forth in its lengthy and detailed analysis. In addition, Petitioners' Statement of the Case fails to present a balanced presentation of the history of the proceedings and the respective contentions of the parties, as also required by Rule 2117. In fact, nowhere in their brief do Petitioners acknowledge that the Commission heard testimony from five witnesses concerning Kademani's distress over G.D.'s HIV status and the circumstances surrounding G.D.'s departure from Canal Side.

Furthermore, Petitioners fail to comply with the directive in Rule 2119 (Argument) to accompany all references to evidence or matters appearing in the record with a citation to the place in the record where the matter referred to appears. Petitioners' disregard of this rule allows for numerous statements in Petitioners' brief for which no support in the record can be found.[15] With regard to the general content of the Argument portion of Petitioners' brief, comprising three-and-a-half pages, we find it sufficient to say that it relies entirely on assertions either specifically rejected by the Commission or unsupported by the record. *Compare* Pa. R.A.P. 2119 (pertaining to the content of the Argument portion of appellate briefs).

We do not suggest that a failure to comply with the Rules of Appellate Proce-

---

immediately put on a toileting program. In G.D.'s cases this is precisely what happened.
(Commission's op. at 37.)

**15.** Among the unsupported assertions included in Petitioners' brief are the following: G.D. had been passed from lodging to lodging;

G.D. refused to use the bathroom; she refused to follow staff instructions and remained uncooperative; she required clean-up every four to five hours; and she required significantly more care than other residents at Canal Side. (Petitioners' brief at 13.)

dure in and of itself renders an appeal frivolous. Rather, the rules are to be liberally construed to secure the just, speedy and inexpensive determination of every matter to which they are applicable. Pa. R.A.P. 105. Rule 105 specifically states that the court may disregard the requirements or provisions of the rules in the interest of expediting a decision or for other good cause shown. However, the rules serve a number of important purposes; as illustrated here, adherence to the rules serves to define the appeal. Had Petitioners complied with the above-cited rules, they may have identified issues and/or formulated arguments that could be characterized differently.

"An award of counsel fees by this court on the ground that an appeal is frivolous is discretionary." *Watkins*, 689 A.2d at 1022. In exercising its discretion, this Court is mindful of the need to avoid unjustly penalizing an appellant for exercising her right to fully exhaust her legal remedies. *Id.* Typically, we excuse minor

failures to adhere to the above stated principles and minor violations of the applicable procedural rules and confine attorney fee awards to the more egregious circumstances.[16]

Nevertheless, there is no bright line applicable to a determination under Rule 2744, and there certainly is no requirement that a party's conduct be outrageous in order to support an award of counsel fees for a frivolous appeal. As previously stated, an appeal is frivolous when it has no basis in law or in fact. *Kachurak v. Department of Transportation, Bureau of Driver Licensing*, 913 A.2d 982 (Pa.Cmwlth.2006). Stated otherwise, a frivolous appeal is one in which no justifiable question has been presented and which is readily recognizable as devoid of merit in that there is little prospect of success. *Pennsylvania Department of Transportation v. Workmen's Compensation Appeal Board (Tanner)*, 654 A.2d 3 (Pa.Cmwlth.1994).[17] Moreover, as we are mindful of the need to avoid unjustly pe-

---

**16.** For example, in *Watkins*, the award of counsel fees was supported by the following observations:

> The brief filed on behalf of claimant reflects a cavalier and unprofessional attitude by claimant's counsel.... [T]he statement of the facts, the summary of the argument and the argument portions of the claimant's brief reveal that counsel did not even conduct a cursory review of the brief before it was filed with this court. These portions of claimant's brief recite erroneous facts and reveal that these portions of the brief clearly apply to an entirely different appeal....

*Id.* at 1022.

**17.** The court in *Tanner* stated as follows:

> We have considered Claimant's request for the award of attorneys' fees, and we agree with his assessment that PennDOT's appeal is frivolous. PennDOT argues that the Board's decision is not supported by substantial evidence. Clearly there is substantial evidence to support the Board's decision and we find no valid issue for appeal. PennDOT, by its appeal asked this Court to

reweigh the evidence, which we do not have the power to do. A frivolous appeal is one lacking any basis in law or fact. Penn-DOT's appeal is frivolous.

*Tanner*, 654 A.2d at 5 (citation omitted). *Accord, Wright v. Workers' Compensation Appeal Board (U.S. Air, Inc.)*, 717 A.2d 596 (Pa. Cmwlth.1998).

See also *Wellington Farms, Inc. v. Township of Silver Spring*, 679 A.2d 267 (Pa.Cmwlth. 1996) (affirming on the basis of the trial court's comprehensive opinion and citing *Tanner*); and *Waste Management v. Unemployment Compensation Board of Review*, 168 Pa.Cmwlth. 633, 651 A.2d 231 (1994) (awarding costs, but not counsel fees, where the employer's argument was based solely on objected to hearsay evidence). *Compare Solomon Simmons v. Delaware County Tax Claim Bureau*, 796 A.2d 400 (Pa.Cmwlth.2002) (holding that because the case presented a novel approach to the question of proper service, the case was not so obviously frivolous as to warrant sanctions).

nalizing an appellant, so too are we mindful that "there exists a duty on the part of counsel not to pursue baseless claims or frivolous issues." *Watkins* at 1022.

In the present case, because the Commission relied on direct evidence of discrimination and applied the analysis set forth in *Allison* to reach its conclusions, Petitioners' argument in this regard has no basis in law. Because Petitioners rely solely on assertions of fact that were thoroughly rejected by the Commission, Petitioners' appeal has no basis in fact. In addition, Petitioners' meager brief fails to comply with the Rules of Appellate Procedure in significant respects. Further, the record supports G.D.'s contention that this appeal was taken solely for purposes of delay.[18] Under these circumstances, we agree that the appeal is frivolous, warranting an award of counsel fees against Petitioners and their counsel pursuant to Pa. R.A.P. 2744. *Watkins.*

Based on the foregoing, we affirm the Commission's order and direct G.D. to file a bill of costs, including reasonable attorney fees, with this court within thirty days.

### ORDER

AND NOW, this 20th day of October, 2011, the order of the Pennsylvania Human Relations Commission, dated September 28, 2010, is affirmed.

In addition, pursuant to Pa. R.A.P. 2744, the application for counsel fees and delay damages filed by intervenor G.D. is granted, and we direct G.D. to file a bill of costs, including reasonable attorney fees, with this court within thirty days.

---

18. On February 14, 2011, G.D. filed a petition to enforce the Commission's order, asserting that Petitioners failed to seek a stay or a supersedeas and refused to comply with the Commission's order. G.D. requested that a decision on the petition be expedited on the basis of evidence that Petitioners had taken steps to avoid compliance with the Commission's order; Petitioners had recorded a deed transferring Kademani's property to her grandchild for $0 and Kademani's husband had applied for incorporation of an entity called Walnutport Manor, LLC, to operate the facility currently known as Canal Side.

Following argument, this Court granted G.D.'s petition in part and ordered Petitioners to post security in the amount of $60,000. The required security was posted in the form of cash.