# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

E.M.,                                 :

                  Petitioner        :

                                   :   No. 1159 C.D. 2017

         v.                            :

                                   :

Department of Human Services,    :

               Respondent    :

 

J.K.,                                    :

                  Petitioner        :

                                   :   No. 1185 C.D. 2017

         v.                            :   Argued: June 4, 2018

                                   :

Department of Human Services,    :   **SEALED CASE**

               Respondent    :

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION**
**BY JUDGE SIMPSON**                **FILED: JULY 19, 2018**

In these consolidated cases, E.M. (Boyfriend) and J.K. (Mother) petition for review of an order of the Department of Human Services (Department), Bureau of Hearings and Appeals (BHA), which adopted a recommendation by an Administrative Law Judge (ALJ) to deny their respective appeals seeking to expunge an indicated report of child abuse from the ChildLine and Abuse Registry.[1] The indicated report named Mother and Boyfriend as perpetrators of child abuse, as defined by the terms of the Child Protective Services Law (CPSL), 23 Pa. C.S.

---

[1] The ChildLine and Abuse Registry is an organizational unit of the Department that operates a statewide toll-free system for receiving reports of suspected child abuse, refers the reports for investigation and maintains the reports in the appropriate file. 55 Pa. Code §3490.4.

§§6301-6386.  The report identified Mother's then two-year-old son, Z.L. (Child), as the victim of the abuse.  Wyoming County Human Services, Inc., formerly known as Wyoming County Children and Youth Services (CYS),[2] filed a notice of intervention in each appeal.  For the reasons that follow, we affirm the BHA's order.

## I. Background
## A. Hearing (Generally)

The ALJ found the following facts.  The alleged abuse occurred when Child, born in January 2014, was approximately two-and-a-half years old.  Boyfriend is Mother's paramour and resided with Mother and her children at the time the abuse occurred.  Mother shared custody with Z2L (Father), Child's biological father.

In September 2016, CYS received a referral regarding concerns over physical abuse of Child.  CYS assigned Kyle Verrill as the Child Protective Services Caseworker (Caseworker).  During the investigation, Caseworker and other CYS personnel took and viewed photographs of Child's injuries.  They also spoke with Mother and medical personnel and reviewed Child's medical records.

Caseworker learned that Child spent Friday, September 2, and Saturday, September 3, 2016, until 2 p.m. in Father's custody.  Thereafter, Child was in the custody of Mother from 2 p.m. on September 3, through Monday, September 5, 2016.  Boyfriend was present in the home with Child during that time.

---

[2] Although Wyoming County Human Services is a named party in this appeal, the ALJ consistently referred to it as CYS.  To avoid confusion, we will also refer to Wyoming County Human Services as CYS.  See In re E.A., 82 A.3d 370, 372 n.1 (Pa. 2013).

On September 5, 2016, Mother took Child to Geisinger-Wyoming Valley Hospital with a left leg injury. Geisinger immediately flew Child to its medical center in Danville, Pennsylvania. Based on X-rays, lab tests, a CT scan and physical examinations, Geisinger's doctors diagnosed Child with a left femur fracture, lacerated liver and multiple bruises to different areas of his body, which were in various stages of healing.

In November 2016, CYS filed an Investigation/Assessment Outcome Report (Investigation Report), also referred to as a CY-48 Report. See ALJ Hr'g, 6/16/17, Ex. C-1; E.M.'s Reproduced Record (R.R.) at 25a-29a. The Investigation Report indicated Mother and Boyfriend as perpetrators of physical abuse to Child.

In December 2016, Boyfriend and Mother each appealed the indicated report. An evidentiary hearing before the ALJ followed.

## B. CYS' Medical Testimony

At the hearing, the parties stipulated to the qualifications of CYS's medical expert, Dr. Edward Fannon (CYS's Pediatrician), as an expert in pediatric medicine. CYS's Pediatrician testified by telephone. He treated Child during his stay at Geisinger-Danville. Mother told CYS's Pediatrician that on the Monday morning she brought Child to the hospital, Child awoke in the morning with left leg swelling. However, on the previous Saturday evening, Mother took Child to a fair, where he ran around and played with his sister and other children. Mother also

3

initially told CYS's Pediatrician that Child lived with her and his sibling, and that there were no other adults present.

Upon examination, CYS's Pediatrician observed multiple bruises, in different stages of healing, to Child's ear, chest, abdomen, groin and right thigh. The bruise to the ear was to the pinna and the scalp behind the ear. The bruise indicated that either someone intentionally grabbed the ear with a knuckle pressing on the scalp, or forcefully pinned the ear against the scalp.

CYS's Pediatrician further testified that although a fall could have caused the bruise to Child's chest, a child's torso is usually spared because a child will break the fall with his or her hands. The chest bruise could have been caused by someone or something striking Child. CYS's Pediatrician also testified the bruise-like abrasion to Child's groin could have been caused by a fall or some type of trauma. The bruises to Child's thigh were not likely from a fall as most children bruise their shins, not their thighs.

CYS's Pediatrician further testified that Child's chest and thigh bruises could have happened as early as the Friday before his hospital admission. However, the bruising to the ear occurred more recently. Mother told CYS's Pediatrician that she noticed various bruises on Child over the past two months after he began visitation with Father. CYS's Pediatrician also observed that laboratory testing ruled out a Factor V clotting disorder as a cause of Child's bruising.

4

In addition, CYS's Pediatrician testified he ordered lab testing and a CT scan because Child had a tender abdomen. The test results revealed a lacerated liver. The doctor testified it takes a significant amount of force to cause a liver laceration. A fall from a couch or chair would not cause a liver laceration. If the liver laceration occurred a day or two prior to the femur fracture, Child would not have been playful and happy during that time.

CYS's Pediatrician acknowledged that a fall from an all-terrain vehicle (ATV) could cause a liver laceration. However, if Child fell from a moving ATV and lacerated his liver, he would have been in a significant amount of pain. Moreover, abrasions, rather than bruising, should have been present.

CYS's Pediatrician also noted that Child suffered from a comminuted oblique fracture of the shaft of the left femur, associated with a rotational component. The doctor placed Child in a spica cast for several weeks. This limited Child's ability to move his injured leg or ambulate.

Ultimately, CYS's Pediatrician opined that Child's liver and left femur injuries were the result of child abuse. CYS's Pediatrician further opined that Child would have experienced pain and discomfort from the inflicted injuries.

**C. Mother's Pediatrician's Testimony**

In response, Mother presented medical testimony via telephone from Dr. Vincent Deeney (Mother's Pediatrician), a physician board certified in the field

of pediatric orthopedic medicine. Mother's Pediatrician met with Child's family five weeks <u>after</u> Child's femur fracture. Mother's Pediatrician provided a second opinion as to the mechanism of Child's leg injury.

Based solely on a review of Child's X-rays and a history provided by Child's grandmother, Mother's Pediatrician opined that Child's left femur injury could have occurred when Child's sibling pushed him off a couch.

On cross-examination, however, Mother's Pediatrician testified that at the time he issued his report, he had not reviewed the medical records of Child's treatment at Geisinger. Therefore, he did not know Child suffered a liver laceration and had bruising to multiple parts of his body. Mother's Pediatrician further testified that in view of Child's femur fracture, lacerated liver and multiple bruising, he would have been concerned about child abuse.

**D. Mother's Testimony**

Mother, 26 years old at the time of the hearing, testified she is Child's primary caretaker. In July 2016, two months before the alleged abuse, Mother became concerned about Child's frequent bruising and began taking pictures to document it. Mother stated she also scheduled and attended doctor appointments trying to determine if someone was hurting Child.

In addition, Mother testified that she and her mother have a Factor V clotting disorder, which may cause Child to bruise easily. Mother also expressed concerns that Child's Father was injuring him during visitation. Because of the bruising, Mother took Child to a doctor in July 2016. CYS caseworker Kelly Riley

6

contacted Mother at that time. Mother told the caseworker that she did not know what caused the bruising. Mother stated she discussed the bruising with Father on multiple occasions, and he became angry with her.

During the afternoon of Saturday, September 3, 2016, Father returned Child to Mother a day early. Father told Mother that Child misbehaved and that he had other things to do. Mother learned that Child rode on an ATV with Father. Mother suggested that Child could have been injured when riding an ATV with Father during his custody on September 2-3, 2016.

On the evening of September 3, 2016, Mother and Boyfriend took Child to the county fair. Child appeared happy and played with the couple's other children. The next evening, Mother and Boyfriend returned to the fair and left Child with a babysitter. When Mother picked Child up from the babysitter, he had no trouble walking.

Mother further testified that her five-year-old daughter admitted that she pushed Child off a couch while playing with him on the morning of September 5, 2016, causing the left leg injury. Child would not use his leg, which became swollen.

However, on cross-examination Mother admitted that CYS caseworkers came to her home and met with her, her two children and Boyfriend in July 2016. Mother, her two children and Boyfriend again met with a CYS

7

caseworker in their home in August 2016. Mother admitted that she did not report that she suspected Father of child abuse prior to September 6, 2016.

## E. Boyfriend; Child

Boyfriend did not testify or present any witnesses. Because of his young age, Child did not testify.

## F. Credibility Findings

The ALJ accepted as credible the testimony of Caseworker, CYS's Pediatrician, and Mother's Pediatrician. The ALJ rejected Mother's testimony regarding her explanations of Child's injuries.

## G. Applicable Law

In discussing the applicable law, the ALJ first noted that Section 6303(b.1) of the CPSL defines "child abuse" as the intentional, knowing or reckless causation of bodily injury to a child through any recent act or failure to act. 23 Pa. C.S. §6303(b.1). Section 6303(a) defines "perpetrator" as a "person who has committed child abuse," including: "(i) [a] parent of a child" and "(iii) [a] paramour or former paramour of the child's parent." 23 Pa. C.S. §6303(a)(i), (iii). The Department, through CYS, must file an "indicated report" of child abuse if it determines that substantial evidence exists of the alleged abuse by a perpetrator. Id. This determination may be based on (i) available medical evidence; (ii) the Child Protective Services (CPS) investigation; or (iii) an admission of acts of abuse by the perpetrator. Id.

In an expunction case, the burden is on CYS to present evidence that outweighs any contrary evidence that the petitioner committed child abuse. L.S. v. Dep't of Pub. Welfare, 828 A.2d 480 (Pa. Cmwlth. 2003). Substantial evidence, in the context of a child abuse proceeding, has been defined as "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a); A.O. v. Dep't of Pub. Welfare, 838 A.2d 35 (Pa. Cmwlth. 2003). In determining whether a finding of fact is supported by substantial evidence, a reviewing court must give the prevailing party the benefit of all reasonable and logical inferences that may be drawn from the evidence. R.W. v. Dep't of Human Servs., 128 A.3d 839 (Pa. Cmwlth. 2015); S.T. v. Dep't of Pub. Welfare, 681 A.2d 853 (Pa. Cmwlth. 1986).

Section 6381(d) of the CPSL, 23 Pa. C.S. §6381(d), relating to *prima facie* evidence of abuse in court proceedings, provides:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by the reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

The ALJ also reviewed our Supreme Court's decision in In re L.Z., 111 A.3d 1164 (Pa. 2015). The Court in L.Z. examined prior intermediate appellate interpretations of Section 6381(d), which limited the *prima facie* presumption of abuse to one parent who was present at the time of the injury. The Court concluded these prior decisions were too restrictive. Like here, the situation in L.Z. involved multiple caregivers. Ultimately, the Supreme Court determined that, when applicable, the presumption of abuse in Section 6381(d) requires each parent or

9

person responsible for the child's care to provide evidence rebutting the presumption that he or she actually inflicted the injury or failed in his or her duty to protect the child.

Interpreting L.Z., this Court observed that an individual could rebut the presumption "potentially by testifying that [he] gave responsibility for the child to another person about whom [he] had no reason to fear." T.H. v. Dep't of Human Servs., 145 A.3d 1191, 1203 (Pa. Cmwlth. 2016) (citation omitted). In cases where multiple caregivers testify they gave responsibility for the child to another person whom they had no reason to fear, the fact-finder must weigh the evidence and render a credibility determination. Id.

Further, the ALJ recited various rules applying to fact-finding in expunction cases. Among those rules, the ALJ highlighted the permissible adverse inference arising in certain cases where a party fails to call an available witness with special knowledge who would naturally be in his interest to produce, without satisfactory explanation. The ALJ cited Murphy v. Department of Public Welfare, White Haven Center, 480 A.2d 382 (Pa. Cmwlth. 1984). ALJ's Op., 7/26/17, at 13.

## H. ALJ's Conclusions

In her decision, the ALJ noted Caseworker and CYS's Pediatrician credibly testified in a straightforward manner, lacking interest in the outcome of the case. Following his investigation, Caseworker's report indicated Mother and

Boyfriend as perpetrators of physical child abuse. Caseworker based his decision on his review of Child's medical records, discussions with medical staff and an interview with Mother.

CYS's Pediatrician, a specialist in pediatric medicine, indicated Child suffered a fracture to his left femur and a liver laceration, and he had multiple bruises in various stages of healing on different parts of his body. CYS's Pediatrician testified that these types of injuries impaired Child's ability to walk and caused significant pain. Therefore, CYS's Pediatrician opined that Child unquestionably had been the victim of abuse. The ALJ found that Child's multiple injuries, and the lack of a plausible explanation for them, supported CYS's Pediatrician's opinion.

The ALJ also credited Mother's Pediatrician's medical testimony. Mother's Pediatrician reviewed Child's X-rays and took a history from Child's grandmother. He opined that Child's femur fracture could have occurred when his sibling pushed him off the couch. However, at the hearing, Mother's Pediatrician testified he did not review Geisinger's medical records and was thus unaware of Child's liver laceration or his multiple bruises. In light of these additional injuries, Mother's Pediatrician testified he would have concerns that Child was the victim of child abuse.

In sum, the ALJ reasoned that the credible medical testimony, coupled with the medical records and photographs introduced at the hearing, demonstrated that Child's injuries impaired his ability to walk and caused him substantial pain. Therefore, the ALJ determined CYS met its burden of showing that Child suffered

11

bodily injury. As such, the ALJ determined the evidence supported a finding that Child suffered physical abuse.

Citing L.Z., the ALJ determined the evidence shows Mother and Boyfriend were the caretakers present at the time the abuse occurred. Mother had custody of Child from 2:00 p.m. on September 3, 2016, until she took him to the hospital on September 5, 2016. During this time, Child was also in the presence of Boyfriend, who lived with Mother and Child. In addition, Mother outlined Child's activities during this period. On September 3-4, 2016, Child had no trouble walking and expressed no pain. It was not until the morning of September 5, 2016, that Child exhibited pain and an inability to walk.

In accord with L.Z., the ALJ concluded there was *prima facie* evidence that Mother and Boyfriend caused Child's injuries. Consequently, the burden shifted to Mother and Boyfriend to rebut the presumption that they abused Child.

Although Mother testified in an attempt to rebut the presumption that she abused Child, the ALJ rejected Mother's theories regarding Child's injuries as implausible and contrary to the credible medical testimony. In particular, Mother testified that she and her mother have a Factor V clotting disorder, which might have been passed on to Child. This would account for his bruising. Lab tests, however, were negative for the Factor V disorder.

The ALJ also noted CYS's Pediatrician testified that some of the bruises appeared to be intentionally inflicted. CYS's Pediatrician also disputed

12

Mother's theory that Child could have fallen off his Father's ATV earlier that weekend and that such a fall could have caused his liver laceration. Although CYS's Pediatrician admitted that a fall from an ATV could cause a liver laceration, he testified that Child would have been in severe pain. Moreover, CYS's Pediatrician testified that Child would have suffered more abrasions than bruises from such a fall.

Further, although CYS's Pediatrician acknowledged that a fall from the couch could have caused Child's femur fracture, he opined that it would be unlikely that Child suffered separate accidental incidents causing unrelated injuries. Therefore, the ALJ rejected as not credible Mother's testimony regarding the possible causes of Child's injuries.

The ALJ also observed that Boyfriend did not submit any evidence or testimony to rebut the presumption that he committed child abuse.

Having determined that Boyfriend and Mother failed to successfully rebut the presumption that they were the individuals who committed child abuse upon Child, the ALJ recommended that Boyfriend and Mother's appeals be denied. The same day the BHA issued an order adopting the ALJ's recommendation. Boyfriend and Mother each filed petitions for review.[3]

## II. Issues

---

[3] Appellate review of an agency decision is limited to determining whether the agency's findings were supported by substantial evidence, whether the agency committed an error of law, or whether the agency violated the petitioner's constitutional rights. R.J.W. v. Dep't of Human Servs., 139 A.3d 270 (Pa. Cmwlth. 2016).

13

**A. Boyfriend**

Boyfriend contends the ALJ erred in determining CYS met its burden of proof with regard to Boyfriend where it failed to establish that he and Mother were paramours or that he resided with Mother at the time of the alleged abuse. More specifically, Boyfriend asserts the ALJ erred or abused her discretion: (a) by relying on Caseworker's testimony that Boyfriend resided with Mother and was Mother's paramour; and (b) by relying on Mother's testimony to prove Boyfriend and Mother were in a relationship and living together at the time of the alleged abuse. Boyfriend also argues that even assuming he and Mother lived together as paramours, no proof existed that he was a person responsible for Child's welfare. Further, even assuming the *prima facie* presumption of child abuse in 23 Pa. C.S. §6381(d) applies to him, he nevertheless rebutted the presumption because Mother testified he was not responsible for Child's welfare at that time.

Further, Boyfriend contends the ALJ erred or abused her discretion by accepting CYS's post-hearing brief because he did not receive the hearing transcript prior to the submission deadline for post-hearing briefs, which resulted in his inability to file a post-hearing brief.

**B. Mother**

Mother presents three issues for our review. First, Mother contends CYS failed to establish by substantial evidence that Child's injuries were the result of physical child abuse. Second, Mother asserts the *prima facie* presumption in 23 Pa. C.S. §6381(d) does not apply where the evidence presented at the time of the hearing failed to establish that Child's injuries would not ordinarily exist but for

14

reasons of the acts or omissions of the persons responsible for the Child's welfare. Third, Mother argues, even assuming the *prima facie* presumption in 23 Pa. C.S. §6381(d) applies, her evidence rebutted the presumption.

## III. Discussion (Boyfriend)
### A. ALJ's Decision
### 1. Argument
### a. Paramour; Residence

Boyfriend first asserts CYS failed to establish a *prima facie* case of child abuse against him because it could not prove he was Mother's paramour or that he lived with her. In particular, Boyfriend alleges Caseworker failed to present any admissible evidence showing any connection between himself and Mother.

Further, Boyfriend argues, given Mother's lack of credibility, any weight given to her testimony that he lived with her or acted as a caregiver for Child constituted an abuse of discretion. To that end, Boyfriend asserts Mother's testimony related only as to the time of the hearing and not to the relevant time frame. Further, her testimony on cross-examination was not part of CYS's case-in-chief and constituted statements by a "co-perpetrator" that CYS identified as untruthful and which the ALJ found not credible.

### b. *Prima Facie* Presumption

Alternatively, Boyfriend contends CYS failed to prove he was a "person responsible for the child's welfare" as defined by 23 Pa. C.S. §6303(a) and required by 23 Pa. C.S. §6381(d). Boyfriend maintains that none of the evidence

suggests that he provided care for Child. To that end, Mother testified Boyfriend had no role in caring for Child in August or September 2016. Thus, even if CYS established that child abuse occurred and that Boyfriend was a perpetrator, the *prima facie* presumption in 23 Pa. C.S. §6381(d) is inapplicable because Boyfriend was not a person responsible for the child's welfare.

### c. Rebuttal of Presumption

Even assuming the *prima facie* presumption of abuse applied to him as a paramour, Boyfriend argues the record shows he rebutted the presumption. He asserts the ALJ incorrectly stated in her opinion that he provided no defense in this case and that he failed to rebut the presumption of child abuse in 23 Pa. C.S. §6381(d). To that end, Boyfriend maintains CYS failed to prove the elements necessary to create the presumption under Section 6381(d) by failing to establish he was a person responsible for Child's welfare.

Further, although Boyfriend did not call any witnesses or submit any exhibits, he did elicit testimony from Mother that he was not a person responsible for the care of Child, a necessary element of Section 6381(d). As noted above, Mother testified Boyfriend was not a caregiver. See N.T. at 176, R.R. at 321a. He had no role in "watching or doing anything" with her children, including feeding or bathing them, in August or September 2016. Id. Boyfriend points out the ALJ relied on Mother's testimony that he resided with her and that they were paramours. Therefore, given Mother's testimony that he was not responsible for Child's care, Boyfriend argues the ALJ's determination that he could not rebut the presumption of child abuse based on Mother's testimony constituted an abuse of discretion.

16

## 2. Analysis

### a. Boyfriend's Paramour Status; Presence in Home

CYS's Investigation Report found Boyfriend to be Mother's 34-year-old paramour and that he was present in the house at the time the abuse occurred. See R.R. at 25a-29a. At the hearing, Caseworker testified that during the investigation, which included interviews with Mother, he learned that Boyfriend and Mother lived together as boyfriend and girlfriend. ALJ Hr'g, Notes of Testimony (N.T.), 6/16/17, at 13-14; R.R. at 158a-59a. In particular, Caseworker testified his investigation revealed that Boyfriend and Mother were living together on September 5, 2016, the day Mother brought Child to the hospital. N.T. at 15; R.R. at 160a.

On cross-examination by CYS, Mother testified that Boyfriend lived and cohabited with her at the time she brought Child to the hospital on September 5, 2016. N.T. at 177; R.R. at 322a. Mother further testified Boyfriend was present in her home when CYS caseworkers met with her and her children in July and August 2016. N.T. at 178-80; R.R. at 323a-25a.

Boyfriend asserts that the ALJ erred by relying on Caseworker's testimony about his presence in the home, which was based in part on the Investigation Report (R.R. at 26a), and based in part on medical records from Geisinger (R.R. at 56a).

Boyfriend's hearsay assertion lacks merit. Hearsay testimony, when corroborated by admissible testimony, may, as a whole, satisfy CYS's burden to

17

justify a conclusion of abuse. E.A.; R.J.W. v. Dep't of Human Servs., 139 A.3d 270 (Pa. Cmwlth. 2016). Mother testified at the ALJ's hearing that Boyfriend lived with her in her home and was present at the time the abuse occurred. Although Mother testified to these facts on cross-examination rather than as a part of CYS's case-in-chief, her testimony nevertheless corroborated the Investigation Report and the medical records. Id.

We also reject Boyfriend's argument that the ALJ erred in relying on Mother's testimony after finding her not credible as to the causation of Child's injuries. The ALJ found Mother not credible "with regard to how [Child] was injured." ALJ's Op., Finding of Fact (F.F.) No. 62. In her discussion, the ALJ explained that Mother's theories as to how Child sustained his injuries "were implausible and contradicted by the credible medical testimony." ALJ's Op. at 16. However, the ALJ did not reject Mother's testimony as a whole or as to the nature of her relationship with Boyfriend.

### b. Boyfriend's Status as Caregiver

Alternatively, Boyfriend argues CYS failed to establish he was responsible for the welfare of Child, a requirement that must be met in order for the *prima facie* presumption of abuse to apply to him. Mother testified on cross-examination that Boyfriend had no role in watching or doing anything with her children. N.T. at 176; R.R. at 321a. The ALJ made no express credibility findings regarding this testimony. In her decision, the ALJ reasoned:

> 23 [Pa. C.S.] §6303 defines a 'perpetrator' as a
> 'person who has committed child abuse and is a parent of
> a child, person responsible for the welfare of a child, an

18

individual residing in the same home as the child, or a paramour of the child's parent. [Mother] qualifies as a 'perpetrator' as defined as she is the biological mother of [Child]. [Boyfriend] qualifies as a 'perpetrator' because he is the paramour of [Mother] and resided in the residence with [Child]. While [Boyfriend's] counsel argues [Boyfriend] does not qualify as a perpetrator of abuse as there is no evidence he was in a caretaking role of [Child], this argument fails as that is not a requirement of 23 [Pa. C.S.] §6303.

ALJ's Op. at 14 (emphasis added).

Boyfriend argues that none of the testimonial or documentary evidence presented in this case established he provided any permanent or temporary care, supervision, training or control of Child. As such, Boyfriend asserts he cannot be considered a "person responsible for [Child's] welfare," as required by 23 Pa. C.S. §6381(d), to invoke the *prima facie* presumption that he committed child abuse, either by his actions or his failure to act. L.Z.

In contrast, CYS argues the record shows Boyfriend and Mother were Child's caregivers during the two days leading up to Child's hospitalization on Monday, September 5, 2016. Mother testified Boyfriend lived with her children in her home. N.T. at 143, 164, 165, 166, 177; R.R. at 288a, 309a, 310a, 311a, 322a. Mother also testified on cross-examination that Boyfriend was present in her home when CYS caseworkers visited her and her two children in July and August 2016. See N.T. at 178-81; R.R. at 323a-26a.

Further, Mother testified she was Child's primary caregiver, not his sole caregiver. N.T. at 177; R.R. at 322a. Although Mother testified that Boyfriend did

19

not have any role in "watching or doing anything" with her children in August or September 2016, N.T. at 176; R.R. at 321a, he nevertheless resided in the home and cohabited with Mother. Therefore, CYS argues, it is not unreasonable to assume that Boyfriend, as mother's paramour in the home, possessed some level of responsibility for Child's welfare and care. See CYS' Br. at 26.

Since 2013, the CPSL has defined "perpetrator" as "[a] person who has committed child abuse as defined in this section." 23 Pa. C.S. §6303(a). The definition of "perpetrator" further provides that the following shall apply:

(1) The term includes only the following:

(i) A parent of the child.

(ii) A spouse or former spouse of the child's parent.

(iii) A paramour or former paramour of the child's parent.

(iv) A person 14 years of age or older and responsible for the child's welfare or having direct contact with children as an employee of child-care services, a school, or through a program, activity or service.

(v) An individual 14 years of age or older who resides in the same home as the child.

(vi) An individual 18 years of age or older who does not reside in the same home as the child but is related within the third degree of consanguinity or affinity by birth or adoption of the child.

(vii) An individual 18 years of age or older who engages a child in severe forms of trafficking in persons or sex trafficking ….

20

(2) Only the following may be considered a perpetrator for failing to act, as provided in this section:

(i) A parent of the child.

(ii) A spouse or former spouse of the child's parent.

(iii) A paramour or former paramour of the child's parent.

(iv) A person 18 years of age or older and responsible for the child's welfare.

(v) A person 18 years of age or older and resides in the same home as the child.

Id. (emphasis added).

In her decision, the ALJ rejected Boyfriend's argument that he did not qualify as a "perpetrator" because CYS presented no direct evidence that he functioned in a caretaking role for Child. Specifically, the ALJ reasoned that CYS need not also establish Boyfriend's role as a person responsible for Child's welfare where the records show Boyfriend lived with Mother and was present in the home in the days immediately preceding Child's injury. ALJ's Op. at 14.

A perpetrator commits child abuse by intentionally, knowingly or recklessly causing "bodily injury" to a child through any recent act or failure to act. 23 Pa. C.S. §6303(b.1)(1). The CPSL defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa. C.S. §6303(a). The medical evidence shows that Child's injuries met this definition. Pursuant to the CPSL's definition of a perpetrator, either a paramour or a person 18 years of age or older residing in the

21

same home may be determined to be a perpetrator based on his actions or his failure to act.

Here, 34-year-old Boyfriend lived with Mother as a paramour in the same home as Child. There is no evidence or allegation that there was another person over the age of five living in the household with Mother, Boyfriend and Child. Boyfriend was present in the home during the time period in which Child sustained a liver laceration, a broken left femur and some bruising. Consistent with the statutory definition of "perpetrator," the record supports the ALJ's determination that Boyfriend and Mother were perpetrators of child abuse, either through their actions, or their failure to act. 23 Pa. C.S. §6303(a).

In addition, regarding the CPSL's definition of "[p]erson responsible for the child's welfare," the record supports an inference that Boyfriend had some temporary role as a provider of supervision for Child when Mother was unavailable or distracted. From a commonsense, common experience perspective, the temporary supervision could arise when Mother attended to her personal comfort or hygiene, when Mother attended to the needs of her other pre-school child, or other periods of unavailability or distraction.

More broadly, the circumstances supporting application of the rebuttable presumption to Boyfriend include: 1) the liver laceration, the twisted, broken left femur and some of the bruising constituted child abuse and were "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child," 23

22

Pa. C.S. §6381(d); 2) 34-year-old Boyfriend lived in the home with Mother as her paramour, and he thus satisfied the statutory definition of "perpetrator," 23 Pa. C.S. §6303; 3) Boyfriend and Mother were the only people over the age of five living in the home, and thus were the sole possible sources of adult supervision in the home; 4) Child was age two, and Child's sibling was age five, and they were therefore incapable of appropriately supervising themselves or each other; 5) Boyfriend and Mother took the young children to a county fair together on an evening shortly before Child was taken for treatment of injuries; 6) Boyfriend was physically present in the home during the period in which Child sustained significant injuries; and 7) Boyfriend did not testify that he had no role as a caregiver. CYS, as the prevailing party before the ALJ, must be given the benefit of all reasonable and logical inferences that may be drawn from the evidence. R.W.; S.T.

Given the foregoing, the ALJ properly applied the *prima facie* presumption of abuse to Boyfriend as well as to Mother. L.Z.; T.H. Therefore, the burden shifted to Boyfriend to present credible evidence that he had no responsibility for Child's welfare. L.Z; T.H.

### c. Rebuttal of Presumption

It is within the province of an ALJ to accept or reject the testimony of any witness, in whole or in part. R.J.W. Further, determinations regarding credibility and the weight of the evidence are solely within the province of the ALJ. Id. The ALJ need not accept as credible Mother's testimony that Boyfriend did not function as a caregiver for Child during August and September 2016. To that end, the ALJ reasoned that the evidence supported an inference that Mother and

23

Boyfriend "were the caretakers present with the subject child at the time the abuse occurred." ALJ's Op. at 15 (emphasis added). In particular, the ALJ recognized that "from 2:00 p.m. on September 3, 2016 until [Mother] took [Child] to the hospital on the morning of Monday, September 5, 2016," Child was in the custody of Mother and in the presence of Boyfriend, who lived with Mother. Id. Based on this evidence, the ALJ, citing L.Z., determined a *prima facie* case of child abuse existed against Boyfriend and Mother.

We again emphasize that a person's presence in the same home as the abused child, either as a resident adult, or paramour of the child's mother, meets the definition of a perpetrator under 23 Pa. C.S. §6303(a). Where there are multiple adults present, the presumption in 23 Pa. C.S. §6381(d) shifts the burden to each of the adults to prove they were not the child's caregivers. L.Z.; T.H. The ALJ had the discretion to reject Mother's testimony that Boyfriend had no caregiving responsibilities regarding Child. R.J.W.

Further, Boyfriend did not testify or present credible evidence that he did not function in any capacity as a caregiver or that Child's injuries were accidental. In L.Z., the Supreme Court reasoned that a person may rebut the presumption in 23 Pa. C.S. §6381(d) by testifying "[he] gave responsibility for the child to another person about whom [he] had no reason to fear or perhaps that the injuries were accidental rather than abusive." L.Z., 111 A.3d at 1185.

Here, Boyfriend did not testify, and the ALJ found Mother's testimony not credible as to the cause of Child's injuries. Where a witness is available,

possesses special knowledge relevant to the case, and whose testimony would not be cumulative and would be ordinarily expected to favor that party, a fact-finder may draw an adverse inference from that witness's failure to testify. O'Connor v. Pa. Pub. Util. Comm'n, 582 A.2d 427 (Pa. Cmwlth. 1990); Murphy. This rule applies to a party's failure to testify in his own case, even if he was available to either side. Delaware Cty. Lodge No. 27 v. Twp. of Tinicum, 908 A.2d 362 (Pa. Cmwlth. 2006). Boyfriend does not address this permissible adverse inference in his brief, although the issue was clearly raised in the ALJ's decision.

Therefore, we discern no error in the ALJ's ultimate determination that Boyfriend failed to successfully rebut the *prima facie* presumption in 23 Pa. C.S. §6381(d) that he committed child abuse upon Child, either by his actions or his failure to act. L.Z.; T.H.

### B. Post-Hearing Brief

### 1. Argument

In this procedural due process challenge, Boyfriend contends the ALJ erred or abused her discretion by accepting CYS's post-hearing brief because Boyfriend did not receive the hearing transcript within the 30-day period following the hearing provided for submitting a brief. More specifically, Boyfriend asserts, at the end of the hearing on June 16, 2017, the ALJ announced that briefs by the parties, whether or not they contained citations to the record, would be accepted within 30 days of the hearing date. The ALJ indicated that the transcripts would be provided to the ALJ and CYS within two weeks. With regard to Boyfriend and Mother, the ALJ stated:

25

> If counsel for either Appellant wants to obtain a copy of the transcript, you can either do so privately <u>or you can contact our office to make arrangements to review our copy of the transcript.</u>

N.T. at 203; R.R. at 348a (emphasis added).

On July 10, 2017, CYS mailed its brief to the ALJ. CYS' brief utilized citations to the transcripts. Therefore, Boyfriend asserts, CYS must have received the transcript as early as July, 9, 2017, and most likely earlier. Further, the record includes an invoice from a court reporter dated July 1, 2017, but it was not mailed until July 12, 2017. <u>See</u> R.R. at 350a-51a. Boyfriend's counsel did not receive the invoice until July 17, 2017, a day after the deadline for submitting briefs.

In view of such disparate treatment, Boyfriend maintains that the ALJ's acceptance of CYS's brief amounted to an *ex parte* communication. Boyfriend argues the taint of this improper communication cannot be wiped away at this late stage. As such, the ALJ's adjudication and order should be reversed.

In response, CYS argues there is no evidence of an *ex parte* communication, which, by its nature, involves the inclusion of one party in a consultation with a judge when another party is excluded. <u>Commonwealth v. Gonzalez</u>, 112 A.3d 1232 (Pa. Super. 2015).

Here, all parties were present and represented by counsel at the hearing. Each party was privy to the same testimony and possessed copies of the parties' exhibits. Further, the ALJ informed the parties that the post-hearing briefs did not have to include citations to the transcript.

Moreover, Boyfriend failed to submit a brief to the ALJ despite the ALJ's invitation to do so. Also, unlike Mother's counsel, Boyfriend's counsel did not make a timely request for an extension of time to submit a brief.

Based on the strength of its case, CYS further argues it is doubtful that a post-hearing brief from Boyfriend would have altered the ALJ's ultimate determination. Therefore, any remand to the ALJ for Boyfriend to file a brief would only result in an identical repeat of this appeal and constitute a waste of judicial resources. CYS thus requests that this Court address Boyfriend's appeal on the present record.

The Department also asserts in its brief that the ALJ's acceptance of CYS's post-hearing brief did not constitute an *ex parte* communication. Here, CYS included Boyfriend's and Mother's counsel on the submission of its post-hearing brief. The Department argues CYS' submission of its brief was not an *ex parte* communication.

Therefore, the Department points out, CYS filed its brief in a timely manner and served it on all parties. A hearing officer's decision to accept or not accept post-hearing briefs is discretionary. See Phila. Outdoor Advertising v. Dep't of Transp., 690 A.2d 789 (Pa. Cmwlth. 1997). Here, the Department argues the ALJ did not abuse her discretion by accepting CYS' timely filed brief.

The Department further argues Boyfriend waived any challenge to CYS' brief by failing to preserve the issue before the ALJ. A party may not raise an issue in a judicial appeal that was not raised before the agency unless the agency is not competent to resolve it. 2 Pa. C.S. §703(a); Victor v. Dep't of Labor & Indus., 647 A.2d 289 (Pa. Cmwlth. 1994). Here, Boyfriend failed to protect his interest at the administrative level by not filing a post-hearing brief or asking for an extension of time to file a brief. In addition, Boyfriend could have asked the ALJ to arrange a time when he could view the BHA's copy of the transcript .

In support of its position, the Department cites Allison v. Pennsylvania Human Relations Commission, 716 A.2d 689 (Pa. Cmwlth. 1998). In Allison, a case involving similar circumstances, the appellants did not receive a hearing transcript from the Pennsylvania Human Relations Commission until the day after the deadline for filing post-hearing briefs expired. The appellants argued they were denied procedural due process because they were not permitted to file a post-hearing brief. However, they did not receive the hearing transcript until after the submission deadline expired. Noting the appellants never attempted to submit a brief and never requested an extension of time to submit a brief, the Commission entered a final order. On appeal, this Court rejected the appellants' due process challenge on the basis that they could have either filed a late brief or requested an extension of time. By failing to do either, the appellants failed to avail themselves of the process afforded them.

## 2. Analysis

We reject Boyfriend's characterization of the ALJ's acceptance of CYS's post-hearing brief as an *ex parte* communication. An *ex parte* communication is a communication between a party's counsel and the court when the opposing counsel is not present. Gonzalez. Here, both parties were present and represented by counsel at the hearing. Counsel were privy to the same testimony, and each possessed copies of the parties' exhibits. Further, CYS served copies of its post-hearing brief on Boyfriend's and Mother's counsel. Consequently, CYS's timely submission of its post-hearing brief cannot be considered an *ex parte* communication. Id.

We also reject Boyfriend's argument that he was denied procedural due process. Although Boyfriend did not receive an invoice for the transcript until the day after the submission deadline, he never attempted to file a brief or request an extension of time to file a brief. By not raising this issue before the ALJ, Boyfriend waived it. 2 Pa. C.S. §703(a); Victor.

Further, by not attempting to file a brief or requesting an extension of time to file a brief, Boyfriend failed to utilize the process available to him. In addition, Boyfriend could have asked the ALJ to arrange for him to view the transcript prior to the expiration of the 30-day period. By not taking any of these actions, Boyfriend cannot claim the ALJ violated his procedural due process rights. Allison.

## IV. Discussion (Mother)
### A. Substantial Evidence of Child Abuse

## 1. Argument

Mother first contends CYS failed to present substantial evidence proving Child's injuries resulted from child abuse. CYS may issue an indicated report of child abuse if it determines that substantial evidence of the alleged abuse by a perpetrator exists. 23 Pa. C.S. §6303(a); G.V. v. Dep't of Pub. Welfare, 91 A.3d 667 (Pa. 2014). This determination may be based on (i) available medical evidence; (ii) the CYS investigation; or (iii) an admission of acts of abuse by the perpetrator. 23 Pa. C.S. §6303(a); G.V. "Substantial evidence," in the context of a child abuse proceeding, has been defined as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a); A.O. Thus, to reach a conclusion of abuse, the evidence must so preponderate in favor of a conclusion that it outweighs any inconsistent evidence and reasonable inferences therefrom. R.J.W.

Mother asserts Child suffered three injuries. First, CYS's Pediatrician testified a radiologist diagnosed Child with a comminuted oblique fracture of the shaft of the left femur, associated with a rotational component. N.T. at 74. Second, CYS's Pediatrician testified about a series of bruises on Child's body, including the areas around his ears, chest, thighs, and groin or stomach. N.T. at 79-83. The bruises were in different stages of healing. Id. at 79. Third, CYS's Pediatrician testified Child suffered a liver laceration. Id. at 83-84. This type of injury requires a significant amount of force such as an automobile accident or a direct blow. Id. at 84. Given the constellation of the bruises, the femur fracture and the liver laceration, CYS's Pediatrician concluded Child was the victim of child abuse. Id. at 90.

However, CYS's Pediatrician testified that Child's femur fracture could have possibly resulted from his older sister pushing him off the couch. Id. at 102. Mother's Pediatrician also testified that a push or shove off the couch by Child's sister could have caused his fractured femur. Id. at 129-33.

As to the bruising, CYS's Pediatrician acknowledged that Child's family had a history of Factor V protein deficiency, which is a clotting disorder. Id. at 95. Further, excessive internal bleeding could cause a bruising appearance. Id.

With regard to the liver laceration, Mother maintains the uncontested evidence established Child visited Father, and they rode on an ATV on Saturday, September 3, 2016, two days prior to the reported injury. CYS's Pediatrician agreed at the hearing that a fall from a moving vehicle could generate enough force to cause a liver tear. Id. at 84, 100. Mother argues CYS presented no evidence that the liver laceration resulted from abuse as opposed to an ATV accident.

Although CYS's Pediatrician testified he believed a child suffering from a liver laceration and femur fracture would not be as active as Child appeared at the county fair on the evening of September 4, 2016, the doctor testified that when he first examined Child he had only mild tenderness in the left lower quadrant of Child's abdomen. Id. at 72. Mother posits such limited pain would not hamper Child's activities the day before she brought him to the hospital. Mother argues CYS failed to carry its burden of establishing that Child's injuries, including the liver laceration, were more likely than not the result of child abuse.

31

Conversely, CYS argues that Mother and Boyfriend met the CPSL's definition of perpetrators and that credible medical evidence sufficiently established that Child's injuries were the result of child abuse. CYS further argues that Mother and Boyfriend failed to provide a plausible alternative explanation for Child's injuries. CYS maintains it properly listed Mother and Boyfriend as the perpetrators of physical child abuse.

## 2. Analysis
### a. Mother's Custody of Child

First, it is undisputed that Mother had custody of Child from 2:00 p.m. on September 3 through September 5, 2016. F.F. No. 10; N.T. at 157. After Child was flown from Geisinger-Wyoming Valley to Geisinger-Danville, CYS's Pediatrician examined and treated Child on September 5-6, 2016. F.F. No. 19; N.T. at 67. Mother told CYS's Pediatrician that Child awoke on the morning of September 5 in pain with left leg swelling. F.F. No. 20; N.T. at 69. The prior evening, Child and his sister ran around and played at the county fair.[4] F.F. No. 21; N.T. at 69. Mother initially told CYS's Pediatrician that Child lived with her and his sister and that there were no other adults present in the home. F.F. No. 22; N.T. at 71.

---

[4] Despite the ALJ's finding and CYS's Pediatrician's testimony that Mother took Child to the fair the night before she brought him to the hospital, Mother clarified that she and Boyfriend took Child to the county fair on Saturday, September 3, 2016. On Sunday, September 4, 2016, they took Child to a babysitter when they returned to the fair. Regardless, Mother testified that Child ran around, played and had a good time with the babysitter. See N.T. at 182-83; R.R. at 327a-28a.

## b. Multiple Bruises

Upon examination, CYS's Pediatrician observed multiple bruises on Child's ear, chest, abdomen, groin and right thigh in different stages of healing. F.F. No. 23; N.T. at 72-73. The bruise on Child's ear involved the pinna and the scalp behind the ear. F.F. No. 24; N.T. at 77. CYS's Pediatrician opined that it appeared someone intentionally grabbed Child's ear and a knuckle caused the bruise to the scalp. Id.

As to mechanism of the bruise to Child's chest, CYS's Pediatrician testified that it could have resulted from a fall. F.F. No. 25; N.T. at 80. However, CYS's Pediatrician further stated that most children at that age would put their hands out when falling down. Id. Therefore, the torso would usually be spared and the child would have bruises to his arms and legs. Id. Another potential cause for this injury, CYS's Pediatrician added, would be that someone or something struck Child. F.F. No. 26; N.T. at 80.

As to mechanism of the bruise to Child's groin, CYS's Pediatrician testified that it could have resulted from a fall or some other type of trauma. F.F. No. 27; N.T. at 81.

CYS's Pediatrician further testified it is unusual for a child to bruise his front thighs in a fall. F.F. No. 28; N.T. at 83. The doctor stated when kids fall, they usually bruise their shins, not their thighs. Id.

With regard to when the bruises occurred, CYS's Pediatrician testified that the bruises on Child's chest and thigh could have occurred on the Friday before Child's hospital admission. F.F. No. 29; N.T. at 106. However, the bruising to Child's ear was more recent. Id.

CYS's Pediatrician also recalled that Mother informed him that she observed various bruises on Child during the past two months. F.F. No. 30; N.T. at 72. The doctor also testified that Child underwent lab tests which ruled out a Factor V clotting disorder as a cause of Child's bruises. F.F. No. 31; N.T. at 110.

### c. Liver Laceration

When examining Child, CYS's Pediatrician observed that Child's abdomen was tender and ordered lab tests and a CT scan, which revealed Child suffered a liver laceration. F.F. No. 32; N.T. at 75. The doctor stated it takes a significant amount of force to cause a liver laceration. F.F. No. 33; N.T. at 84. A fall from a couch or chair would not cause a liver laceration. F.F. No. 34; N.T. at 84.

CYS's Pediatrician further testified that if the liver laceration occurred a day or two prior to the femur fracture, the pain from the liver laceration would not have allowed Child to be playful and happy. F.F. No. 35; N.T. at 117.

CYS's Pediatrician did acknowledge that a fall from a moving ATV could cause a liver laceration. F.F. No. 36; N.T. at 99. However, the doctor continued, if Child lacerated his liver by falling from an ATV, he would have been

in significant pain and he would have suffered more abrasions than bruises. F.F. No. 37; N.T. at 103, 111.

### d. Left Femur Fracture

As discussed above, CYS's Pediatrician testified that a radiologist described Child's left leg fracture as a comminuted oblique fracture of the shaft of the left femur, associated with a rotational component. F.F. No. 38, N.T. at 74. This resulted in Child being placed in a spica cast for several weeks which limited his ability to ambulate. F.F. No. 39; N.T. at 85. CYS's Pediatrician opined that the leg fracture was a result of child abuse. N.T. at 113.

### e. Medical Opinion of Child Abuse

CYS's Pediatrician opined that given the constellation of the liver injury, the femur injury and the bruising, Child was the victim of child abuse. F.F. No. 40; N.T. at 90-91. CYS's Pediatrician further opined the injuries, especially the femur fracture and liver laceration, would have been very painful. F.F. No. 41; N.T. at 84-85.

### f. ALJ's Determinations

Although Mother offered various theories as to how Child sustained his injuries, the ALJ rejected Mother's testimony regarding the causes of Child's injuries. F.F. No. 62. The ALJ further explained that Mother's theories regarding Child's injuries were implausible and contradicted by the credible medical testimony. ALJ's Op. at 16.

35

In particular, the ALJ noted that Mother indicated Child may have a Factor V deficiency, a clotting disorder, which could cause bruising. However, CYS's Pediatrician testified that lab tests showed Child was negative for any blood disorders, including the Factor V deficiency. Id.

In addition, the ALJ recognized CYS's Pediatrician testified that some of the bruises appeared to be intentionally inflicted. Id. The ALJ also noted that although CYS's Pediatrician agreed that a fall from a moving ATV could cause a liver laceration, he explained that such a severe trauma would cause significant pain, which is contrary to Mother's testimony about Child's activities following his period of custody with his Father. Id.

Finally, the ALJ reasoned, although a fall from a couch could have caused the fractured femur, CYS's Pediatrician opined it was unlikely that the constellation of Child's injuries would result from separate accidental incidents. Id. For these reasons, the ALJ rejected Mother's testimony regarding the possible causes of Child's injuries.

### g. Reasoning

In an expunction case, the county agency bears the burden of establishing the report of abuse is accurate and supported by substantial evidence, which the CPSL defines as evidence that outweighs inconsistent evidence and that a reasonable person would accept as adequate to support a conclusion. R.J.W. An ALJ is free to accept or reject the testimony of any witness, in whole or in part. Id.

Further, determinations regarding credibility and the weight of the evidence are solely within the province of the ALJ. Id.

Here, the ALJ accepted CYS's Pediatrician's testimony and opinions as credible. F.F. No. 61. An indicated report of child abuse may be based on the available medical evidence. 23 Pa. C.S. §6303(a); R.J.W. As discussed above, CYS's Pediatrician testified that based on the constellation of the liver injury, the femur injury and the bruising, Child was unquestionably the victim of physical child abuse. F.F. No. 40; N.T. at 90-91. CYS's Pediatrician also opined that Child's injuries were very painful and restricted his ability to move his legs and ambulate. F.F. Nos. 39, 41; N.T. at 84-85, 90-91. As such, Child's injuries meet the CPSL's definition of "bodily injury" in 23 Pa. C.S. §6303(a) and "child abuse." 23 Pa. C.S. §6303(b.1).

Although Mother testified regarding her theories that Child may have been bruised and injured in a fall from an ATV while in Father's custody, she presented no credible evidence that such a fall ever occurred. In fact, the ALJ rejected as not credible all of Mother's theories regarding how Child sustained his injuries. ALJ's Op. at 15. Consequently, the ALJ assigned little or no weight to Mother's testimony regarding causation of Child's injures. Id.

Further, the ALJ accepted as credible Mother's Pediatrician's testimony that, based on a review of an X-ray, Child could have suffered the femur fracture when pushed off the couch by his older sibling. ALJ's Op. at 15. Nevertheless, the ALJ also noted that Mother's Pediatrician testified that he did not

review any of the Geisinger medical records and was thus unaware of the Child's bruising and liver laceration. Id. In particular, the ALJ noted Mother's Pediatrician testified that based on those other injuries, he would have concerns of child abuse. Id.

Consequently, the ALJ concluded that the evidence "clearly supports that [Child] was physically abused." Id.

Given the lack of credibility of Mother's testimony as to causation of Child's injuries and the fact that Mother's Pediatrician was unaware of Child's bruising and liver laceration, we hold that CYS's evidence, including CYS's Pediatrician's testimony and opinions, sufficiently established that Child's injuries were the result of physical child abuse. R.J.W.

**B. Applicability of Presumption**

**1. Argument**

Mother next contends the ALJ erred in determining that the *prima facie* presumption in 23 Pa. C.S. §6381(d) applied here because CYS failed to present evidence that Child's injuries would not ordinarily exist but for either Mother's acts or omissions. *Prima facie* evidence, Mother asserts, is evidence that, in the judgment of the law, is sufficient to prove a given fact, or a group or chain of facts constituting a party's claim or defense, and, which, if not rebutted, will remain sufficient to do so. L.Z. Therefore, evidence that a child suffered an injury that he would not ordinarily sustain but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated the abuse. Id.

38

The parent or responsible person may present evidence proving that he or she did not inflict the abuse. Id.

In the present case, Mother asserts, the evidence that Child suffered a spiral fracture of the left femur while in her custody does not trigger the *prima facie* presumption in Section 6381(d) because it cannot be said that this particular injury would not ordinarily exist but for Mother's acts or omissions. Both medical experts agreed that this type of injury can occur accidentally and unintentionally, including the scenario where Child's sister pushed him off the couch. Therefore, Mother argues, because she provided a plausible explanation for the left femur injury, the *prima facie* presumption does not apply to that injury.

Mother further asserts the same argument applies to the liver laceration and the bruising. Mother became aware of the bruising as early as July 2016, and she reported the same to CYS caseworkers visiting her home at that time. Mother believed the bruising could have occurred at the daycare center, during visitations with Father, or it could have been the result of a genetic Factor V clotting disorder. Mother notes that CYS's Pediatrician testified the bruises were at different stages of healing, suggesting that the trauma appeared over a period of time. Therefore, Mother argues, the *prima facie* presumption against her should not be applied to the bruising.

Mother also maintains that Child's lacerated liver does not trigger the *prima facie* presumption. She testified Child was in Father's custody two to three days prior to his appearance at the hospital. During Father's custody, Child rode on

an ATV with him. Both medical experts agreed that a fall from an ATV could cause a liver laceration.

Further, when Child appeared at Geisinger on September 5, 2016, he was not complaining of abdominal pain. Given these facts, Mother argues it cannot be said that the liver laceration could not exist but for reasons of her acts and omissions.

## 2. Analysis

We recognize that the evidence shows that Child did not complain of a left leg injury until the morning of September 5, 2016, when Mother brought him to Geisinger-Wyoming Valley. At the time Mother discovered Child crying and complaining of a leg injury, Mother and Boyfriend were present in the home. Pennsylvania courts interpret the statutory phrase "by the parent or other person responsible for the welfare of the child" in 23 Pa. C.S. §6381(d) as a term encompassing both the singular and the plural. In re J.G., 984 A.2d 541 (Pa. Super. 2009). "Stated differently, proof of the nature of the child's harm, alone, is prima facie evidence of child abuse by anyone and … all who are found to be 'responsible for the welfare of the child' during the time of the alleged injuries." Id. at 547 (emphasis added).

As discussed above, the ALJ rejected Mother's theories as to the causation of Child's injuries as implausible in light of CYS's Pediatrician's testimony and expert opinion that Child's injuries were "unquestionably" the result of child abuse. See N.T. at 90-91 (emphasis added). In particular, CYS's

40

Pediatrician specifically opined that Child's left femur fracture resulted from child abuse. Id. at 113. Based on his 13 years of dealing with child abuse matters, CYS's Pediatrician testified that a child usually sustains a femur fracture when someone grabs the child's leg and pulls hard and twists the leg at the same time. Id. Therefore, although CYS's Pediatrician agreed that a push from the couch could cause a fractured femur, he did not believe such was the case given Child's multiple bruises and liver laceration. Consequently, based on all the medical evidence, the ALJ rejected Mother's testimony that Child's femur fracture occurred when his sister pushed him off the couch.

With regard to the liver laceration, we agree with CYS that Mother presented no evidence that Child fell from a moving ATV while in Father's custody. In addition, the ALJ accepted CYS's Pediatrician's testimony that if Child sustained a liver laceration while in his Father's custody, he would have been in severe pain when returned to Mother's custody. ALJ's Op. at 16. Therefore, Child would not have been running around and happily playing with his sister at the county fair, either on Saturday or Sunday, prior to his leg injury on Monday morning. Based on CYS's Pediatrician's testimony, the ALJ rejected Mother's theories that third parties, including Father, could have caused Child's liver laceration.

Similarly, the ALJ rejected Mother's testimony that Child's bruises could be attributed to a Factor V protein deficiency that inhibited blood clotting. Lab tests were negative for any blood disorders. The ALJ also observed that CYS's Pediatrician testified that the bruises to the ear and nearby scalp appeared to be intentionally inflicted. ALJ's Op. at 16; N.T. at 78. The doctor also testified that

41

another potential cause of the chest bruise would be someone or something striking the Child's chest. N.T. at 80. Thus, based on CYS's Pediatrician's testimony, the ALJ rejected Mother's theories that third parties, including Father, could have caused all of Child's multiple bruises.

Consequently, given CYS's Pediatrician's credible testimony and opinions of physical child abuse, and the ALJ's rejection of Mother's testimony regarding her theories of what caused Child's injuries, we discern no error or abuse of discretion in the ALJ's determination that the *prima facie* presumption of child abuse in 23 Pa. C.S. §6381(d) applied against Mother, as a parent, in this case. L.Z.

## C. Rebuttal of Presumption

### 1. Argument

Mother further contends that even assuming the *prima facie* presumption of child abuse in 23 Pa. C.S. §6381(d) applied, she nevertheless presented substantial credible evidence to rebut any *prima facie* showing. Mother first reported bruising to Child in July 2016, nearly two months prior to the date of the alleged abuse in this case. At the request of CYS caseworkers, she photographically documented the consistent pattern of bruising. Mother informed CYS that the bruising first came to her attention following Child's visitation with Father. Mother also removed Child from daycare when he returned home with a bite mark.

Therefore, Mother argues, she rebutted any presumption that she physically abused Child. Again, Mother cites her young daughter's admission that

she pushed Child off a couch during the morning hours of September 5, 2016. Mother asserts the evidence also shows that Child was riding an ATV with Father within days of the diagnosis of his liver laceration. Father terminated his visitation early that Saturday afternoon and carried Child into Mother's house. Alarmingly, Mother points out, CYS never interviewed Father regarding these incidents of abuse.

Having rebutted any presumption of responsibility for child abuse, Mother argues the ALJ should have sustained her appeal from the indicated report of abuse. Mother thus requests that this Court reverse the BHA's final order and direct that the indicated report lodged against her be expunged.

## 2. Analysis

Mother primarily relies on testimony that the ALJ rejected as not credible. Mother presented no credible evidence that a third party bruised Child or that Child suffered his liver laceration as a result of a fall from a moving ATV during his visitation with Father. Based on CYS's Pediatrician's opinions, the ALJ also rejected Mother's testimony that Child suffered his left leg injury as a result of being pushed off the couch by his five-year-old sister. The ALJ's determinations as to witness credibility and evidentiary weight are supported by the evidence. Therefore, we will not disturb them on appeal. R.J.W.

In sum, CYS presented credible expert medical testimony that Child was unquestionably the victim of physical child abuse while in Mother's custody. Further, Mother failed to rebut the presumption in 23 Pa. C.S. §6381(d) that Child

would not have ordinarily sustained these injuries except by reason of Mother's acts or omissions.  L.Z.

## V. Conclusion

For the above reasons, we discern no error or abuse of discretion in the ALJ's determination that CYS met its burden of establishing that the Department is maintaining an indicated report of child abuse against Boyfriend and Mother in a manner consistent with the CPSL and its implementing regulations.  Accordingly, we affirm the BHA's order adopting the ALJ's recommendation in its entirety.

ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

E.M., :
              Petitioner :
                : No. 1159 C.D. 2017
      v. :
               :
Department of Human Services, :
          Respondent :

J.K., :
              Petitioner :
                : No. 1185 C.D. 2017
      v. :
               : **SEALED CASE**
Department of Human Services, :
          Respondent :

# O R D E R

**AND NOW**, this 19th day of July, 2018, for the reasons stated in the foregoing opinion, the order of the Department of Human Services, Bureau of Hearings and Appeals, is **AFFIRMED**.

<br>

_____
ROBERT SIMPSON, Judge